**Charles JONES et al., Plaintiffs,**

v.

**Sol WITTENBERG et al., Defendants.**

**Civ. No. C 70–388.**

United States District Court,
N. D. Ohio, W. D.

July 9, 1971.

---

Francis X. Gorman, Toledo, Ohio, for plaintiff Jones.

Other plaintiffs represented by Advocates for Basic Legal Equality and Marshall Desmond, Toledo, Ohio; Stanley A. Bass, New York City, of counsel.

Anthony Pizza, Pros. Atty. of Lucas County, for the Sheriff.

John F. Hayward, Toledo, Ohio, for County Commissioners.

Willard A. Johnson, Toledo, Ohio, City Law Department, for defendant Wright.

## OPINION

DON J. YOUNG, District Judge.

This Court has previously found that the members of the class of plaintiffs, prisoners in the Lucas County Jail, are deprived of their constitutional rights by state officials acting under color of state law, and are entitled to relief at the hands of the Court.[1] At the time these findings were made, the matter was continued for further hearing upon the matter of the relief to which the plaintiffs were entitled. Further hearings have been had, further evidence was offered by means of numerous stipulations, and the case was argued and submitted for decision.

It is obvious, of course, that the matter of affording relief from the deprivation of rights of the class of prisoners is no matter for simple remedies.

Part of the difficulties which must be remedied result from purely physical conditions. Other of the difficulties result from the actions and attitudes of those vested by law with responsibility for the maintenance and operations of prisons, and for the confinement and release of prisoners therein. Some of the laws, which are in the main, very old, have become practically obsolete because of vast social and other changes which have occurred since their enactment. If

---

1. See Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971).

712

such laws could be literally enforced, such enforcement would do little to remedy the conditions present here. Fortunately, it is possible to construe many of these archaic relics as declarations of policy which can be applied to meet the conditions they are designed to deal with, rather than as rules which must be literally enforced. However, to the extent that any of these laws conflict with the basic constitutional rights of the plaintiffs, they must be considered as having been stricken down by the former order of this Court.

As pointed out in the Court's former memorandum, responsibility for the operation of county jails, and thus for the infringements upon the rights of the plaintiffs, is badly fragmented by the laws of Ohio. Powers and duties are granted and imposed by the statutes upon the Board of County Commissioners, the County Sheriff, and the Court of Common Pleas. The Commissioners and the Sheriff are parties to this litigation, and consequently subject to this Court's jurisdiction. They must comply with whatever orders this Court makes unless such orders are reversed or modified on appeal. The Court of Common Pleas, and the judges thereof, are not parties to this litigation, even though their statutory duties in relation to the subject of the action are not judicial, but purely ministerial. However, it is to be assumed that in the exercise of comity, and that respect which exists between the federal judiciary and its state counterparts, should there ultimately appear to be some conflict between the administrative rules which may be necessary to afford the relief which this Court decrees, and the administrative rules which the Court of Common Pleas has promulgated pursuant to the Ohio statutes, there will be no difficulty in that Court changing its rules to the extent necessary, if the reasoning of this Court for finding such necessity of change is sufficiently persuasive. This Court is satisfied that the judges of the Court of Common Pleas are in every respect men and women of learning, integrity, and good will. If the rules they have promulgated differ to any marked degree from what this Court's rulings might seem to require, it is only because they were forced to enact their rules without the benefit of the very considerable amount of evidence and argument which have been offered upon the trial of this cause.

As previously stated, the problems which must be remedied in this case stem from two sources, purely physical matters, and actions and attitudes of public officials. There is no precise line of demarcation between these two sources, nor can they be considered as being entirely separate and independent. Rather, they blend one into the other and are interdependent.

The popular, and simplistic, idea is that the important source of the problems is the purely physical one, and that this is easily remedied. In other words, build a new jail, and everything will be neatly straightened out. There are two things wrong with this idea.

The first, and most important, thing wrong is that the evidence clearly demonstrates that if a beautiful brand new jail were built, and operated the way the present jail is operated, there would be little improvement in the difficulties at first, and what improvement there was would very rapidly disappear.

The second thing wrong is that in order to build a new jail, the public must provide additional funds. This Court has no power whatsoever to require the public to do so. Under our system of government, the ultimate source of power is the people. The people have not given this Court any taxing power, or any control over their use of the taxing power. In Ohio, at least, the people have reserved unto themselves considerably more control over the taxing power than is theoretically consistent with the practical operations of a representative democracy. The problems of the Lucas County Jail, and the present crisis in municipal government operations generally, are obviously the result of this inconsistency. Demo-

cratic governments have failed in the past because of this. It will be interesting to see whether ours will also. Be that as it may, this Court will not attempt to exercise a power that it does not and should not have. There are strong reasons for thinking that a new jail should be built, and that in the long run substantial economies both in money and in lives could be effected by doing so. However, until a majority of the voters of Lucas County become convinced of this, there will be no new county jail.

As a corollary to this, it ought to be understood that if at the next election the people voted the funds for a new jail, it would take probably from three to five years to build it. It also seems likely that if a proper new jail were to be built, there would still be many strong reasons for remodelling, retaining and using the old jail. Hence, any present expenditures that may be required to meet the minimum physical essentials of according the class of prisoners their constitutional rights will not be money wasted if they are made in such a way as to make the old structure better fitted for future use.

Thus it is apparent that in order to be practical, this Court, in attempting to frame relief for the class of plaintiffs, must address itself primarily to dealing with the actions of those of the parties defendant who are before the Court. Actions can be controlled by orders which are within the power of the Court. Attitudes are perhaps not susceptible to change by the direct orders of the Court, but this Court adheres to the James-Lange theory that attitudes proceed from actions, and not vice versa. Hence if the actions are changed, a change in attitude will follow, even though it could not have been compelled to begin with.

It seems quite clear from the evidence that the essential beginning point for the correction of the deprivation of rights of the class of plaintiffs is in the operations of the jail, and this, under the law, is primarily the responsibility of the defendant Sheriff.

The evidence shows that for the calendar year 1971, the defendant Commissioners have appropriated for the Sheriff's operations the sum of $807,-910.00. This is $107,262.59, or 15.3% in excess of the Sheriff's actual expenditures for the preceding calendar year. The evidence also indicates that a considerably larger portion of the Sheriff's expenditures goes for his law enforcement activities than for the operation of the jail, which is also his responsibility. The defendant Sheriff has not challenged the statement of the defendant Board of County Commissioners that only approximately six percent (6%) of the population of Lucas County resides in unincorporated areas of the county where no protection other than the Sheriff's Department is provided. It thus seems clear that in allocating his expenditures, there should be no serious risk to the public if the Sheriff were required to reduce his expenditures for police activities to whatever extent might be necessary to provide for the proper operation of the County Jail. The relatively recent adoption of the Ohio Rules of Civil Procedure should also be reducing, rather than increasing, the needs of the Sheriff's Civil Department, so that there is that further source of funds necessary to handle jail operations.

Under the law of Ohio, after funds are allocated in the county budget for the operations of a county officer, funds can be shifted from one line item to another by the county officer with the approval of the county commissioners. Hence there is no legal impediment to the Sheriff reducing his policing and civil branch expenditures and increasing his jail operation expenditures while remaining within his total allocation of funds. To the extent that the specific requirement of this Court's granting of relief make such line item changes necessary, they must be made and the various defendants are required to make and approve them.

Certain other general changes in accounting and operations will have to be

made in order to grant appropriate relief in this matter. The defendant Commissioners have suggested that changes in food service at the jail might be made by contracting for food service from a private food service company. The evidence also shows that the operations of the county's purchasing department are not properly adapted to food purchasing, as a result of which proper diets have not been provided because perishable foods were not purchased as needed. The jail food service is clearly shown to be a rather large operation. It does not seem economically possible that any food service company which would have to include a margin of profit in its bid could furnish food service more economically than can the Sheriff, who is required by law to do so, since the Sheriff has available a considerable supply of extremely low-cost personal services not available to any private company. Nor is there any reason why the defendant public officials should themselves be lawless, and not conform to all public health food service regulations.

■ Although space problems in the County Jail are critical, the evidence shows that there is space in the jail that is being used for storage of unclaimed or confiscated property, motor oil for county vehicles and other items of stores not appropriate to jail operations. Space is also being used by the county carpenter and the county plumber, and there is totally unused space that by some expenditure of funds could be made usable for rehabilitation and correctional programs not now provided. The defendants must take whatever steps are necessary to terminate the use of space in the jail building for any purposes not directly involved in jail operations, and to make whatever changes are necessary to fit all usable space in the building for use.

The sad reality is that much of the present difficulty stems from a defensive clinging to outmoded usages, and the failure to use some ingenuity or imagination toward making the best use of what is already at hand.

So much for generalities. Specifics are what are needed. A few tentative starts have been made toward improvements in some areas. These will be touched on and included at appropriate points throughout the remainder of this memorandum opinion. In outlining specific relief to be granted, this Court is proceeding upon the basis that the present jail facility will continue to be used for many years in the future so far as purely physical matters are concerned, and that changes in operations will be permanent, regardless of changes in the physical facilities in which they are conducted.

### I. Reduction of Jail Population

■ The first change which must be made is a reduction of inmate population to a point at which there are never more than two persons per cell confined in the jail. In cases where in an extreme emergency the protection of the public demands immediate confinement of a large number of persons, this limit on jail population may be exceeded for a period of not more than twenty-four hours.

■ There are various ways in which the jail population can be reduced. The most effective are a proper bail release program, and prosecution by information instead of indictment. The defendant County Commissioners shall appropriate as promptly as possible such sums as are necessary to enable a qualified organization to make what investigation is necessary in order to minimize the risk of persons admitted to bail failing to appear, and to increase the number of persons placed on bail pending trial.

■ There is considerable question as to the power of any court to control the discretion of a prosecuting attorney to determine whether to prosecute by information or indictment, so no order will be made in this respect, but the necessity to hold persons accused of crime in confinement pending grand jury action will not constitute an excuse for disobeying this Court's order limiting the jail population. The Court is well aware

of the fact which is never mentioned in polite legal or judicial circles that a major reason for holding without bail persons accused of crime is to induce guilty pleas. The excuse generally advanced by prosecuting attorneys that the presentation of a case to the grand jury is the best way of preparing the case for trial and determining whether it can be successfully prosecuted, so that they will only proceed by information when the accused is willing to plead guilty, thus obviating the need for preparation, is merely an excuse. It is an almost classic example of the tendency of large organizations to proceed more for the convenience of their own personnel than for the proper serving of those whom they are supposed to serve. This Court is impotent to act in this area, but it is not deceived, nor does it ask forgiveness for telling tales out of school.

■ The defendants will be given ninety (90) days from the date of the Court's order herein to reduce the jail population to the limits fixed. At any time that a program of remodelling is commenced which will require the temporary vacation of some cell blocks, the limitation to two prisoners per cell may be exceeded during such remodelling. If any portions of the building are converted from cell housing to open dormitory housing, the order with respect to maximum jail population may be modified.

## II. *Interior Lighting*

■ Basic to any correction of the problems in the Lucas County Jail is the matter of interior illumination. The police cars of the City of Toledo carry bumper stickers advocating illumination as an effective way of preventing crime. The problems of filth and assaults upon prisoners in jail by their fellows cannot possibly be controlled in the dark, even by vastly increased numbers of guards. The defendants will be given thirty (30) days in which to present a plan for correcting the jail lighting system to bring it into conformity with Section VII, § 7.04 of Regulation A1–68 of the Toledo District Board of Health, which requires every habitable room to have one ceiling-type light fixture. This Court holds each separate cell in the Lucas County Jail to constitute a habitable room within the meaning of this regulation. In addition, such light fixture shall provide sufficient foot-candles of illumination in each cell to permit the reading of a newspaper according to applicable standards.

Upon the presentation of the plan for lighting changes, the Court will fix a maximum time limitation within which such changes are to be made, which shall not exceed ninety (90) days in the absence of a strong showing of reasons for allowing a longer time.

## III. *Guards*

■ Control of many of the problems in the jail is dependent upon having an adequate number of properly trained guards on duty in the jail at all times. This is entirely the responsibility of the Sheriff. To provide proper personnel for jail operations may require considerable re-deployment of the Sheriff's forces, and a reduction in the number of deputies engaged in police activities. This can be accomplished without substantial risk to the public, and without any increase in the appropriations for personnel in the Sheriff's office, by confining, if necessary, the Sheriff's patrols to operations only in those areas of the County which are unincorporated, and hence without local police protection.

■ Within thirty (30) days from the filing of this Court's order herein the defendant Sheriff shall provide a sufficient number of guards so that there will be at all times not less than two (2) guards on duty on each floor, at least one of whom shall at all times be on patrol of the cell blocks. There shall be a sufficient number of supervisory and relief personnel provided to insure that the required number of guards on duty and their patrolling activities are carried out.

■ All of the jail personnel shall be required immediately to commence the new programed instruction course prepared by the United States Bureau of Prisons for jail officers and jail administrators. Successful completion of this course shall be a requirement for employment or continued employment in the jail.

■ In addition, the defendant Sheriff shall within ninety (90) days after the filing of this Court's order submit a comprehensive plan for the selection and in-service training of jail personnel, which shall include as a minimum, in addition to the training hereinbefore required, psychological examinations designed to disclose any gross personality defects which would interfere with proper functioning as a jailor, and arrangements for taking any job-related courses in community institutions at county expense, and small salary increases upon the successful completion of off-duty training which will significantly contribute to the employee's ability to handle people and improve his job performance. The plan shall include an estimate of the cost for tuition and salary increases, so that the Court may consider the necessity of an additional appropriation of funds for such cost.

## IV. *Diet and Food Service*

The evidence disclosed a number of problems in connection with the food service to prisoners in the jail, and during the course of hearings some changes were made to improve the situation. The evidence also showed that although proper standards of diet, and menus in conformity with those standards were known to the defendant Sheriff's kitchen employees, these standards were sometimes not met because of difficulties with food purchases through the County Purchasing Department.

The defendant County Commissioners will be given ten (10) days from the filing of the order herein to determine whether to permit all food purchases for the jail to be handled directly by the cook in charge of the jail kitchen, or to order the County Purchasing Department to make all changes in the handling of purchases of food for the jail necessary to insure that food will be purchased and delivered to the jail on schedules established by the cook in charge of the jail kitchen. If the defendant County Commissioners elect to take the latter course, this Court will retain jurisdiction to impose appropriate sanctions against any employee of the County Purchasing Department shown to be responsible for any delay in the purchase and delivery of foodstuffs, perishable or otherwise, to the jail.

■ The defendants shall take immediate steps to insure that food and food service at the jail meet the following standards:

1. Minimum nutritional standards shall be maintained as disclosed by the testimony of Mrs. M. De Oliveira and the exhibits in connection therewith;

2. Foods shall be served at the proper temperatures, fresh, and in reasonable variety;

3. Serving methods shall meet minimum standards for food service in restaurants;

4. Kitchen, kitchen equipment, food storage, and sanitation shall meet minimum standards for restaurants;

5. All persons, whether prisoners or employees, working in and around the kitchen and the handling and serving of food in the jail shall meet restaurant health requirements;

6. The jail kitchen and food service shall be regularly inspected by the public health authorities on the same basis as restaurants serving the public, and the recommendations or requirements made by the public health authorities as the result of such inspections shall be implemented by the defendants within the time allowed therefor by said public health authorities.

### V. Classification of and Program for Prisoners

██ Within thirty (30) days from the filing of the order herein, the defendant Sheriff shall submit proposals for classification of prisoners and inmate programs, which shall include an estimate of the number and kinds of additional qualified personnel required to direct and carry out such programs, estimates of the cost thereof, and the necessity of additional funds beyond the amount of the Sheriff's present budget to meet such costs. These proposals shall, as a minimum, deal with the following matters:

1. *Classification and diagnostic procedures for each prisoner at intake.* Since the rights of the two classes of parties plaintiff prisoners awaiting trial and prisoners serving sentence are in law different, proposals may provide for a total and complete separation of these two classes. However, in the event such separation is established, the same intake and diagnostic procedures shall be used to determine the following individual needs:

 (a) Custody

 (b) Housing in different groups

 (c) Crisis intervention needs

 (d) Group or individual counselling

 (e) Educational or vocational training needs, or both

 (f) Employment needs

 (g) Religious needs

 (h) Family needs

2. *Establishment of work or study release programs, particularly for prisoners serving sentences.* No plan will be approved by this Court that does not provide for a program of this type for prisoners serving sentence.

3. *Establishment of group and individual counselling programs.*

4. *Establishment of basic and remedial education programs.*

5. *Expansion of existing religious programs.*

6. *Establishment of a recreation program,* including especially outdoor and indoor exercise programs.

7. *Establishment of a constructive work program,* which shall include, for prisoners not presenting security risks, maintenance and other interior work at the jail, and the doing of work in or about other county facilities under the direction of county employees other than the jail staff.

8. *Establishment of visiting programs,* which shall include daily visiting hours, both in the daytime and in the evening, and especially upon holidays and weekends; the provision of much more adequate physical facilities for visitation; removal of the limitations on visits by children and by persons not members of the prisoner's immediate family; and provisions for limitation or removal of visiting privileges for disciplinary purposes, or for abuse of visiting privileges.

### VI. Sanitation and Personal Hygiene

██ The Court recognizes that until the problems of lighting and guards are met, it is difficult to enforce the existing rules. Nevertheless, immediate steps must be taken to effectuate an organized and supervised program of daily cleaning, including mopping, scrubbing, wall washing, etc., which will insure that the inmates clean their own cells, the plumbing fixtures therein and make their beds for inspection by the supervising guard officer at a specified time each morning. Punishment for violations shall be made by withdrawal of privileges. Obviously, until some proper programs of privileges are inaugurated, it may be difficult to enforce discipline by withdrawing privileges. However, as previously pointed out, the various problems to be attacked are not discrete, but are interrelated. Solutions will thus necessarily be interrelated also.

1. Clean blankets, sheets, pillow and pillow case, towel and wash cloth shall be issued each newly com-

mitted prisoner, and a regular and frequent program established for issuing fresh linens.

2. Prisoners shall be dressed in jail clothing and all items shall be laundered and exchanged regularly.

3. Each prisoner who does not bring such items with him when he enters the jail shall be furnished with soap, toothbrush, toothpaste, and shaving gear so as to be able to maintain good personal hygiene.

### VII. *Medical Program*

The jail's medical program is obviously unsatisfactory, both from the standpoint of the services provided, and the physical facilities available for examinations, care and treatment. This appears from the Ohio statutes to be primarily the responsibility of the defendant County Commissioners. The evidence indicated some effort to improve the situation by making some increase in the salary for the jail physician, but there was nothing to show that that could or would meet the problems. The evidence does not show that the services of a full-time jail physician are necessary, but it clearly shows that medical services should be available on a full-time basis. The present system leans too heavily upon the jail nurse, who does not appear even to be a registered nurse, but a licensed practical nurse. While it is probable that some increased expenditures may be required to furnish adequate medical care, it seems that in this area, as in many others, some imagination and ingenuity might be more useful.

 In the area of medical services, the following standards must be implemented:

1. A physician must be available on call at all times.

2. Every entering prisoner must receive a medical examination before being assigned to a regular cell.

3. There must be a daily sick call attended by a licensed physician.

4. Arrangements must be made to meet the needs of prisoners with special medical problems.

5. The jail nurse must not be permitted to prescribe medication of any kind.

6. The part-time services of a dentist must be made available on call.

The Court suggests that in preparing a plan for the provision of adequate medical services, investigation be made into using the practice found in the emergency rooms of large metropolitan hospitals of engaging the part-time services of intern and resident physicians, and of using, under proper supervision, the services of medical clerks who are students in the upper classes of the Medical College of Ohio at Toledo.

 The defendants will be given thirty (30) days from the date of entering the Court's order to submit proposals for improving the physical facilities to provide the following:

1. Ample and adequate rooms and equipment for conducting physical examinations of inmates and entering prisoners.

2. Ample and adequate rooms and equipment for treatment of medical emergencies, and minor injuries and illnesses.

3. Quarters for inmates who are too ill to remain safely as part of the general population of the prison, but not sufficiently ill to require hospitalization.

4. Adequate facilities for dental examinations and treatment, both curative and preventive.

The proposals shall include estimates of the time and expense involved in implementing them, with a showing of cause if the time in any particular proposal exceeds one hundred twenty (120) days.

### VIII. *Communication and Attorney Visitations*

 It is recognized that there are legal reasons for making distinction between the two classes of plaintiffs

with respect to the right of communication with persons outside of prison, and that communication also involves security problems. Prisoners who are serving sentence are properly subject to some restrictions on communication, to the extent that this may be a desirable form of punishment. The determination of what is proper punishment, and how useful the concept of punishment may be as a preventive of further wrongdoing are beyond the power of the court and the scope of this opinion. Obviously, however, prisoners who are awaiting trial are not to be punished at all, except to the extent necessary to preserve order among members of a group living in close quarters. Hence, prisoners awaiting trial may not be limited in their communications with persons outside except to the extent necessary to prevent abuse of the privilege, or as a means of enforcing discipline generally. Some difference in rules is also necessary between written communication and telephone communication. The defendants shall submit within thirty (30) days after the date of filing of this Court's order proposals for granting communication privileges to meet, as a minimum, the following standards with respect to prisoners awaiting trial:

1. There shall be no censorship of outgoing mail.

2. There shall be no limitation on the persons to whom outgoing mail may be directed.

3. There shall be no censorship of incoming letters from the prisoner's attorney, or from any judge or elected public official.

4. Incoming parcels or letters may be inspected for contraband, but letters may not be read.

5. Proper arrangements shall be made to insure that prisoners may freely obtain writing materials and postage.

6. Indigent prisoners shall be furnished at public expense writing materials and ordinary postage for their personal use in dispatching a maximum of five (5) letters per week.

7. Provisions shall be made for as many telephone calls as are necessary for a person who is without counsel to obtain counsel.

8. Provisions shall be made for prisoners to make local telephone calls during stated hours.

9. Prisoners' telephone calls shall not be monitored.

Proposals for communication by prisoners under sentence may limit the above standards to the following extent:

1. Standards 2, 4, 7, 8 and 9 need not be applied; and

2. Reasonable limitations may be placed upon the number of letters dispatched.

With respect to attorney visitation, the defendants shall within thirty (30) days from the filing of this Court's order submit proposals for the providing of physical facilities in which prisoners may consult privately with their attorneys, and with their witnesses when the witnesses are accompanied by attorneys. Other consultation with witnesses shall be treated as ordinary visitations or communications. The physical facilities for attorney visitation shall be sufficient in number to accommodate a minimum of three separate visitations at one time. Each separate visiting area shall be sufficiently soundproof so that conversations therein may not be overheard, properly illuminated, properly ventilated, equipped with chairs and a writing desk or table, and shall be sufficiently large to accommodate a maximum of four (4) persons. If any of these proposals will require more than sixty (60) days to implement, reasons for requiring additional time, and the amount of time required, shall be set forth.

### IX. *Reading Materials*

Prompt arrangements shall be made for library service to prisoners. There shall be no censorship of books or periodicals supplied to, purchased by,

or given to prisoners, except that the defendant Sheriff may, in his discretion, forbid the introduction into the jail of books or periodicals which would come clearly within the definition of pornography established by the decisions of the Supreme Court of the United States.

### X. *Discipline*

 It is obviously essential that proper disciplinary measures be taken to maintain order, safety, and security of and within the jail. However, the use of the two solitary confinement cells in the jail shall be permanently discontinued. Isolation may properly be used as a disciplinary measure, but only for physically violent prisoners whose behavior jeopardizes the health and safety of other inmates. Any isolation facilities must be furnished with proper heat, light, ventilation and sanitary facilities, must not be used for extended periods of time, and prisoners placed in isolation must not be deprived of clothing. Isolation shall differ from normal confinement only in the loss of freedom and privileges permitted to other prisoners. Prisoners who appear to be dangerously violent or suicidal must be examined immediately by a physician, and if he deems it advisable, removed to a mental hospital.

 Discipline imposed should have a direct relationship to the institutional rule violated, and should be sufficiently immediate in time that the relationship is recognized by the individual. It must have no relationship to the acts or alleged acts which have led to the prisoner's incarceration. This obviously requires that the rules of the jail, and the penalties for violation, must be established in advance, and made clearly known to all inmates. The necessity of immediacy precludes the making of elaborate provisions for hearing officers, witnesses, and hearing procedures. This does not mean that disciplinary measures may be imposed arbitrarily or for long periods of time, or that no records need be kept thereof. Particularly it does not mean that prisoners should be permitted to make or enforce any disciplinary rules whatsoever. Disciplinary authority may only be exercised by prison personnel.

 In general, discipline in the future is to be enforced by loss of privileges. Written records must be kept on an individual basis showing the time and place of the infraction of the rules, and the disciplinary measure imposed. Any prisoner aggrieved by a particular imposition of discipline shall have the right to ask that it be reviewed at a higher level of authority than that of the authority which imposed it.

### XI. *Alterations and Repairs to Physical Plant*

The only physical changes that have been considered in this opinion to this point have been those concerned with lighting, although it is clear that in order to meet the practical problems of setting up the various programs for food service, medical care, visitation, recreation and rehabilitation programs, and even cleanliness and personal hygiene, many changes and repairs will be needed.

Since it is the function of the defendant County Commissioners to provide a jail, the burden of most of the necessary changes will fall upon them.

Proposals have been offered in evidence for extensive remodelling of the cell houses, and other remodelling and changes to make maximum use of the present structure. The costs of making these changes must be compared with that of repairing the present facilities without alteration. These matters have both long-term and short-term considerations to be weighed. Before it is practical to do much correction of the physical facilities, a reduction in population and an increase in personnel are essential. While correction of the lighting stands on the same plane with these two matters from a priority standpoint, it is closely related to the decision on the nature and extent of the interior changes to be made. Since the defendants have

only been given thirty (30) days to present a plan to correct the lighting, necessarily the other basic determinations with respect to space utilization and remodelling will have to be made within the same time.

 Whether the defendants elect to proceed by repairs or remodelling, the following standards must be met:

1. There must be illumination as previously ordered;

2. There must be adequate heating in the cold seasons and adequate ventilation at all times;

3. There must be hot and cold water at least for bathing, in accordance with the Board of Health housing regulation standards;

4. There must at all times be adequate, working toilets;

5. All leaks in plumbing must be repaired immediately, even though to do so requires an increase in the number of plumbers employed full-time by the County;

6. There must be provision for an adequate and sanitary supply of drinking water;

7. The interior of the jail must be kept painted with light-colored, washable enamel; failing this, the defendant Sheriff shall comply with the letter of Section 341.04 of the Ohio Revised Code;

8. If the present cells are not to be replaced with new cells and open dormitory housing, the cell-locking system must be placed in good working order; and

9. The special requirements set forth in connection with all foregoing portions of this opinion shall be met.

The defendants shall within such thirty (30) day period submit to this Court their proposals, including time schedules, for meeting these physical problems. If these proposals contemplate a period greater than one (1) year for meeting any one or more of the foregoing requirements, a statement of reasons why the greater time is necessary shall be included.

## XII. *Continuing Jurisdiction*

 This Court will retain continuing jurisdiction over this action and the parties thereto until the various periods of time hereinbefore fixed, and any extension thereof which may be granted, shall have expired, and for a sufficient length of time thereafter to make it reasonably certain that the changes of methods and practices required will not be abandoned, forgotten, or neglected, but have become permanently established.

## XIII. *Damages*

 The complaint includes a prayer for damages, and the law seems to contemplate that damages are presumed to result from the proof of a deprivation of civil rights, without the necessity of any showing of actual damages. This concept, however, in such an action as this one, presents a basic, and perhaps irreconcilable conflict in legal principles. It is clear that civil rights actions are basically equitable. Damages may, of course, be awarded in equitable actions, but the Court of Appeals for this Circuit has held very explicitly in the case of National Union Electric Corp. v. Wilson, 434 F.2d 986 (6th Cir.), that punitive damages may only be fixed by a jury, in an action at law, and may not be allowed by a chancellor. It seems to this Court that damages awarded merely because of a violation of rights, other than nominal damages, can only be considered as punitive damages, which this Court has been held without power to allow.

In any event, the evidence in this case, overwhelming as it may be in establishing the deplorable condition of the jail in which the class of plaintiffs was confined, fails to show that the mistreatment which confinement therein constitutes is the result of any actual malice or ill-will upon the part of any of the defendants. Neither is there any evidence of any particular item of actual damage suffered by any member of the class of plaintiffs. It does not seem equitable to single out these defendants and mulct them in damages for continuing practices which are commonplace, and of very ancient usage. Especially would it seem unjust to do so when it is clear that up to at least a time shortly before this action was commenced, it was and perhaps it still may be the desire of a majority of the electorate that the county jail be an unpleasant and degrading, perhaps even a savagely cruel, place to be. Should the servant be punished for not refusing to obey the wishes of his master? At least in this case, this Court thinks not.

The Court therefore concludes that an award of even nominal damages is not appropriate in this case. Costs, however, including reasonable fees for expert witness, to be agreed upon by the parties or fixed by the Court, will be assessed against the defendant County Commissioners in their official, and not in their individual, capacities.

Just prior to final argument the defendant Sheriff and the defendant Homer Roberts filed a motion for their dismissal as parties defendant on various grounds. The motion is unworthy of serious consideration or comment. It is overruled.

This opinion will serve as the Court's findings of fact and conclusions of law. Counsel for the plaintiffs shall promptly prepare and submit an order expressive of these findings and conclusions, in accordance with Rule 2(a) of the Rules of this Court.