**Don TATE et al., Plaintiffs,**

v.

**Howard C. KASSULKE et al., Defendants.**

Civ. A. No. C 75–0031 L(A).

United States District Court,
W. D. Kentucky,
Louisville Division.

Dec. 23, 1975.

On Motion to Alter or Amend,
March 4, 1976.

652

Curtis B. Stuckey, Kurt Berggren, Legal Aid Society of Louisville, Louisville, Ky., for plaintiffs.

Joseph V. Mobley, Louisville, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN, District Judge.

This action was brought pursuant to 42 U.S.C. § 1983 by various inmates of the Jefferson County Jail seeking, among other things, preliminary injunctive relief to enjoin the prison officials from allegedly continuing to violate their constitutional rights. An evidentiary hearing was held which lasted two and one-half days. No complete transcript has been made of the testimony.

It should be first observed that a similar action was filed in District Judge Rhodes Bratcher's court in 1972 which resulted in an agreed judgment that provided for the furnishing of certain amenities and necessities to the inmates. See *Clements, et al. v. Hamilton, Sheriff, et al.,* Civil Action No. 7001, decided October 6, 1972. That agreed judgment more specifically provides, insofar as applicable, as follows:

1. Written rules, regulations and penalties are to be given the inmates and a three-man disciplinary board shall be continued in use to determine whether an offense has been committed and what action should be taken.

2. No censorship of outgoing mail to attorneys, elected officials and legal service organizations is permitted. Incoming mail is not to be read but to be opened and checked for contraband and other restricted items.

With these exceptions, the consent decree and final judgment entered by Judge Bratcher did not pertain specifically to the matters at issue in this action.

The plaintiffs in the instant action have related in some detail the alleged lack of sanitary conditions, access to showers, access to recreation, vermin infested conditions, lack of medical attention, cruel beatings, unconstitutional reading of their mail, and lack of due process with respect to solitary confinement and segregation.

Before entering into a discussion of the various allegations made by the plaintiff, the Court takes notice of the fact that the Jefferson County Jail is a building constructed many years ago for a much smaller inmate population, and that it is a facility intended to be used for the housing of prisoners who are charged with crimes prior to their actual trial, and that some prisoners may remain there as long as 15 months while awaiting trial.

The Court also notes that after many years of complaints concerning the con-

ditions at the jail, some of which were beyond the control of the jail authorities, a new jail is now being constructed which should eliminate many of the problems caused by the advanced age and gradual deterioration of the present jail.

## SANITARY CONDITIONS

The Court finds, insofar as sanitary conditions are concerned, that the inmates are supplied clean linens, soap and a change of clothing once a week, and that efforts have been made, although not completely satisfactory, to eliminate the rats, mice and other vermin which are undeniably present to some extent in the jail. In this connection, it is noted that the jail authorities disinfect the jail approximately once a month.

The Court believes that in light of the defendant's bona fide efforts to eliminate the rodents and other pests which are present in the jail, and in light of the expenditures made by the defendants to maintain the jail in a reasonably healthy condition, that no injunctive relief is needed with regards to allegations made by the plaintiffs about the sanitary conditions. We are cognizant of District Judge Young's opinion in *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971), aff'd. by the Sixth Circuit under the name of *Jones v. Metzger,* 456 F.2d 854 (1972). We believe, however, that the sanitary conditions at the Jefferson County Jail are far superior to those horrifying conditions described by Judge Young in his opinion.

## BRUTALITY

With regards to the question of brutality of jail guards, the inmates recited several incidents. The first is that of Jimmie Stewart, who claimed that he was beaten on January 26, 1975 by Jerome Thomas, a guard, with a chain and attached padlock. The Court finds that Stewart precipitated a fight between himself and Thomas and that Thomas did hit him with a chain, and that no serious injuries were caused to Stewart.

The Court finds that the action taken by Thomas was in self-defense and that on one occasion during the incident the chain was taken from him by Stewart. This holding is not to be construed by the defendants as authorizing the use of chains as a weapon, particularly since the use of such an instrumentality could result in beatings or assaults which were condemned by the Sixth Circuit in *United States v. Georvassilis,* 498 F.2d 833 (1974), and by the Eighth Circuit in *Jackson v. Bishop,* 404 F.2d 571 (1968) in an opinion written by Judge Blackmun, now Justice Blackmun.

The next incident is that of Robert Hunt, who was a mentally disturbed inmate who had set his mattress on fire. He was apparently chained to a lower bunk of a cell next to the plaintiff, Morse. Morse alleges that the guards hit Hunt on several occasions and left him chained to the bed. The defendant's response to this charge is that Hunt was, in fact, mentally disturbed and physically uncontrollable, and that some force was required to prevent him from doing injury to himself or others. The Court did not have the benefit of any testimony by Hunt or any of the guards who allegedly were cruel to him.

The Court recognizes that it would be cruel and unusual punishment and a violation of the Eighth Amendment to chain Hunt to a bed for any protracted length of time. See *Wheeler v. Glass,* 473 F.2d 983 (7th Cir. 1973), where the spread-eagling of juveniles who were tied to a bed for a period in excess of 48 hours was condemned by the court, as being a violation of the Eighth Amendment.

In view of the conflict of testimony as between Calvin Vanderpool, Deputy Director for Treatment at the jail, and the inmates with regards to the Hunt incident, the Court finds that Hunt was not actually chained to a bed for any protracted length of time nor was he assaulted by the employees of the jail.

The next incident was that of Officer Cheatham and inmate Watkins. Inmate

Robinson testified he saw Cheatham throw Watkins across the room and onto the bars of a cell. Watkins had apparently been a trouble-maker but weighed only 140 lbs. as opposed to Cheatham's 210 lbs. There was testimony on behalf of the defendant by Vanderpool that Cheatham had previously killed an inmate who had assaulted him. If Robinson's testimony were to be believed, then Cheatham was, in fact, guilty of a violation of Watkins' Eighth Amendment rights. See *United States v. Georvassilis, supra* and *Jackson v. Bishop, supra.* The Court does not accept Robinson's testimony, especially in light of the fact that Watkins himself did not testify as to the circumstances.

The plaintiffs also testified about three beatings inflicted upon three unidentified inmates and the alleged roughing up of Daniel Lucey when he attempted suicide. As to the first three incidents, we find them to be without persuasive value, and especially lacking in credibility because of their pertaining to unidentified persons. With regards to Lucey, it is apparent that his testimony was highly self-serving, and we decline to enter a finding that he was, in fact, accorded cruel and inhuman punishment on that occasion.

## MAIL

■ The plaintiffs have contended that on occasions their mail has been opened and also that they were denied access to the courts by reason of the requirement that they pay postage for an envelope bearing a bulky complaint. As to the first contention, the Court finds that the jail now imposes no censorship upon mail, either outgoing or incoming, and that the only inspection it makes of mail is that of packages to determine whether contraband is contained therein.

The defendants further have stated to the Court that they are following the rulings of this Court in *Preston v. Cowan,* 369 F.Supp. 14 (W.D.Ky.1973), remanded 506 F.2d 288 (6th Cir. 1974) and the regulations, which holding is quite a bit more liberal to the inmates than are the recent Supreme Court decisions in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) and *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiffs' contention as to the denial of access to the courts is frivolous in light of the decision in the case of *Guajardo v. McAdams,* 349 F.Supp. 211 (S.D. Tex.1972). No cases are cited by the plaintiffs which entitle them to the free use of the United States mails or to a requirement that the jail furnish such services to them.

## VISITATION

■ Another grievance raised by the plaintiffs pertains to visitation. Only one 15 minute visitation period a week is allowed and two visitors are allowed at each such session. Children 13 years or older are considered persons for the purpose of the visitation limitation. Only 5 approved visitors are on the list at each time. The visitation rights afforded by the defendants are admittedly minimal, and in contrast with the liberal visitation rights which obtain at some federal penal institutions.

In *National Prisoners Reform Association v. Sharkey,* 347 F.Supp. 1234 (D.R.I. 1972), the district court held that a penitentiary could not bar access to inmates by outside visitors belonging to the plaintiff association. The court held that there was no "showing that the interest of restraints, retribution, deterrence, or rehabilitation" would suffer, *supra,* at p. 1238.

In *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971), which is a case concerning the Lucas County Jail in Toledo, Ohio, a city which is somewhat smaller than Louisville, it was held that the Sheriff would be required to provide daily visiting hours and would not be able to limit the visits of children and persons not members of the prisoner's immediate family. It was also held that the Sheriff might limit or remove visiting privileges for disciplinary purposes or abuse of visiting privileges.

We are in accord with the principles established by Judge Young in *Jones v. Wittenberg, supra,* but in view of *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal. 1970), aff'd. 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), we do not spell out in detail what visitation regulations the jail authorities should present to the Court, reserving the right to veto any inadequate plan proposed. We do hold that the present visiting regulations are invalid as being overlybroad and stringent, and require the jail authorities to present their new proposed regulations to the Court on or before February 1, 1976. We also find invalid the defendants' regulation which limits to 5 the number of individuals who receive prior clearance. As pointed out by plaintiffs, there are occasions when the immediate family of an inmate exceeds 5, and certainly there must be instances where inmates who are awaiting trial have more than 5 friends who are of good reputation.

## DUE PROCESS RIGHTS

With regards to the due process right of prisoners, the leading case is that of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which holds that where disciplinary measures are taken by a prison, after a prisoner has earned the right to good time, and which may result in his deprivation of his good time credit or a part thereof, he is entitled to a hearing with certain safeguards. These include the right to notice of the charge against him, the right to an impartial fact-finder which does not include any person who witnessed the alleged infraction, the right to present his version of the case, and the right to be represented by a lay assistant, probably another inmate.

While the regulations of the defendant jail authorities do not affect good time, it is apparent that they result in two types of segregation, the first of which arises as a result of a classification of the prisoner at the time he arrives in the jail. This is done by consultation between the jail officials based on records that they receive from law enforcement agencies, and no hearings are held in connection with the decision.

The other type of punitive discipline enforced is that of isolation and, although the average time is 4 to 8 days, there is testimony that such isolation had been enforced for as much as 45 days.

■ With respect to administrative segregation, which occurs near the time of the arrival of the inmate at the jail, we are of the opinion that the defendants, before making a final decision as to the classification of the prisoner, should call him before the classification board and advise him of the reasons that they are proposing to put him in administrative segregation. Usually these reasons will consist of a prisoner's prior record and reputation, and of information secured from other institutions and law enforcement agencies regarding his prior conduct.

Also, as Mr. Vanderpool testified, the gravity of the offense with which the inmate is charged in court would often play a part in the decision of the prison officials.

While we are reluctant to interfere with the administration of the classification system of the jail, we do so since there are serious deprivations which accompany the result of the classification. These include limited exercise and confinement to an isolated ward. We do not require that the prisoner be given the rights provided above with respect to disciplinary segregation, but merely that he be afforded an opportunity to state to the classification board any reason which he thinks would justify his not being placed on the maximum security ward.

■ We note that defendants, at the present time, orally advise the inmates of their alleged infractions of discipline and that a hearing is held, and the inmate is given an opportunity to present witnesses and evidence in his own behalf, and is not always given an opportunity to cross-examine and confront witnesses against him or to have an attorney or some other inmate at the hearing

representing him. However, no permanent written record is kept of the proceedings and the written regulations of the defendants do not spell out the rights of the inmates. It is observed accordingly that the defendants are already observing some of the most important due process requirements mandated by *Wolff v. McDonnell, supra,* and that the only omissions are in failing to supply a written notice of the hearing, setting out briefly the offense which the inmate has allegedly committed, and a brief written recitation of the reasons for the disciplinary action undertaken, and, in addition thereto, the failure to provide for inmate or other assistance in the rare situations where the inmate is either illiterate or the offense with which he is charged is unduly complex. These rights must be given by the defendants in all cases where there is a possibility that an inmate may be confined to isolation as a result of an alleged infraction of a rule of the jail.

Nothing that has been said in this opinion should be construed as a limitation on the rights of the jail officials to postpone the hearings mandated above, on these rare occasions where there is a clear and present danger of a strike, mutiny, riot or rebellion on the part of the jail population, but in the event of such occasions, the hearing should be postponed only until the occasion itself has passed. See *Gray v. Creamer,* 465 F.2d 179 (3rd Cir. 1972) at p. 185, footnote 6.

## RIGHT OF INMATES TO A JAIL LAW LIBRARY

It appears from the evidence that the only law book available in the jailhouse is an ancient Indiana statute, and plaintiffs contend that the lack of adequate law books denies prisoners individually and their jailhouse counselors their rights to access to the courts. It has been held in *Gilmore v. Lynch, supra,* that it is unconstitutional for California to limit, in the name of standardization, the kinds and titles of books available to prisoners in a prison law library. That case, of course, did not concern facilities such as the county jail, which is involved here, but that distinction is not controlling. The Jefferson County Jail is often the custodial institution for inmates who may await trial for as long as 8 to 10 months, as well as being the temporary detention institution for prisoners who have already received sentences and who are awaiting transportation to their ultimate place of confinement. Also, the Jefferson County Jail, in August, 1975, housed 402 inmates and, therefore, ranks as a large metropolitan type place of detention rather than a small county facility found in many areas or small communities which house many less inmates.

In *Cruz v. Hauck,* 475 F.2d 475 (5th Cir. 1973), the court was faced with the lack of library facilities in the Bexar County Jail in Texas. In that case, the jail authorities proposed that legal materials and law books were available to prisoners if they had their own materials or if their lawyers supplied their materials, or if the books were ordered from any publishing company, provided that the materials did not have hard-bound covers, and provided further that the storage and maintenance of the materials did not unreasonably restrict and limit the space of the jail cell block.

The jail authorities also proposed that since every prisoner had the right to have court-appointed counsel, and every attorney had access to the county law library, he would have the materials necessary to seek his legal remedies. The Fifth Circuit stated that the district court should have allowed the inmates an opportunity to prove that these rules would unreasonably impair the constitutional access of the prisoners to the courts.

Since the rendering of these decisions, contrary decisions have been rendered by the First Circuit in *Page v. Sharpe,* 487 F.2d 567 (1973) and by the District Court for the Middle District of North Carolina in *Farrington v. State of North Carolina,* D.C.N.C., 391 F.Supp. 714 (1975). Also, an earlier decision to the same effect is that of *Hatfield v. Bailleaux,* 290 F.2d 632 (9th Cir. 1971).

The First Circuit, in *Page v. Sharpe, supra,* at p. 569, stated that "[u]nder no stretch of the imagination is a county sheriff or his subordinates, required to supply law books", citing *Hatfield v. Bailleaux, supra.* In *Farrington v. State of North Carolina, supra,* Chief Judge Gordon devoted four pages of his opinion to the petitioner's allegation that he was denied access to the courts because the state did not provide a law library for prisoners. In his opinion, Judge Gordon recognized that *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) held that a state could not enforce a regulation which banned inmates from helping other inmates to prepare petitions for submission to courts unless it furnished a reasonable alternative, 393 U.S. at p. 490, 89 S.Ct. 747.

Judge Gordon, in his opinion, relied heavily upon *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341, which held that the Due Process Clause of the Fourteenth Amendment and the Equal Protection Clause of that Amendment do not require the state to provide free counsel for indigent defendants seeking either discretionary appeals to the State Supreme Court, or a petition for certiorari to the United States Supreme Court. Judge Gordon then goes on to reason that a state is not required by the Constitution to furnish law libraries for prisoners, but if it chooses to do so, it must be done fairly, *Gilmore v. Lynch, supra,* and has the burden of proof justifying its action. See *Novak v. Beto,* 453 F.2d 661 (5th Cir. 1971).

■ In light of the apparent conflict between *Farrington v. State of North Carolina, supra,* and *Hooks v. Wainwright,* 352 F.Supp. 163 (M.D.Fla.1972) on the district court level and between *Page v. Sharpe,* 1 Cir., 487 F.2d 567 (1973) and *Cruz v. Hauck, supra,* on the appellate level, and with no decision from the Sixth Circuit or the Supreme Court, we hold that the plaintiffs are not entitled to a preliminary injunction with regards to the establishment of a law library by the jail authorities.

■ This holding is made in the light of the requirement that to obtain a preliminary injunction plaintiffs must show that they have a reasonably good chance of prevailing on the merits, and that the balance of hardship to the moving party if the injunction is denied, as compared to the respondent if the injunction is allowed, must tip in favor of the moving party. See *Kennan v. Nichol,* 326 F.Supp. 613 (W.D.Wis.1971), aff'd, 404 U.S. 1055, 92 S.Ct. 735, 30 L.Ed.2d 743 (1972); and *G. B. C. Inc. v. United States,* 302 F.Supp. 1283, 1284 (E.D.Tenn. 1969).

We are inclined to the view that meaningful access to the courts with regards to jail inmates should be provided, primarily if not entirely, by their access to attorneys, and since *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), of course every person charged with a felony has been entitled to representation by counsel, and more recently, since *Argersinger v. Hamlin, Sheriff,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), every person charged with a misdemeanor which may result in possible imprisonment is entitled to the services of an attorney.

Therefore, every inmate in the Jefferson County Jail is entitled to the services of an attorney with relation to the charges which he is facing in either state or federal court. The same principle, of course, does not apply to several complaints brought by inmates such as habeas corpus petitions or actions under statutes such as 42 U.S.C. § 1983. We observe that habeas corpus does not ordinarily lie until after a conviction has resulted, and that ordinarily after a conviction results, the inmates of the Jefferson County Jail are usually transferred rather quickly to a penitentiary or other place of confinement.

We agree with that portion of Judge Gordon's opinion in *Farrington v. State of North Carolina, supra,* which points out that it is much more preferable for the prisoner to have the services of an attorney rather than the services of various writ writers, even though those writ

writers are furnished with an adequate law library.

These considerations reinforce our conclusion that a preliminary injunction should not be granted to plaintiffs with reference to the law library issue.

## REGULATIONS OF THE JAIL

██ Plaintiffs question the disciplinary regulations of the jail on the grounds that they are overbroad and unduly vague. The penal regulations provide for a sentence of from 3 to 5 days in administrative segregation for possession or passing of contraband, for disrespect, disturbances or fighting, and for destruction of personal property. More serious penalties ranging from 8 days to indefinite administrative segregation is imposed for escape, attempted escape, possession of escape contraband, assault on an employee, sexual assault by an individual or gang, and agitating group resistance to authority.

In *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971), the court held that the offenses of insolence, harassment, and insubordination were not unduly vague, whereas misbehavior or misconduct and agitation were, see p. 656. We believe that the regulations, with the exception of the one pertaining to disturbance, are valid and sufficiently clear. We believe that disturbance, on the other hand, is akin to misbehavior or misconduct and leaves the administrator irresponsible to a fair standard, and offers no reasonable guidance to an inmate.

The regulations provide that penalties will be set according to the seriousness of the offense, and that the list of offenses and possible penalties are "only the guidance [sic] of the Disciplinary Review Board". They provide for an increase or decrease in penalties where the Board had knowledge of evidence or mitigating circumstances. They do not set up any procedure for the conduct of the hearings.

██ While the regulations, as to penalties being related to the seriousness of the offense, and being only for the

guidance of the disciplinary board, are extremely vague, the paragraph which follows them and sets out specific infractions bearing specific penalties would seem to cure the vagueness of the preceding paragraph. It is not the Court's duty to overturn poorly written regulations as long as they are followed by regulations dealing with the same subject which comport with due process, and we see no reason to overturn the regulations at this time, although we suggest that it might be appropriate to redraft them for purposes of clarity and coherence.

With respect to the lack of procedural safeguards, we believe that our holding on pages 8 and 9 of this opinion suffices, except that we further hold that any inmate charged with a disciplinary infraction must be given at least 24 hours notice of the hearing, and further that the hearing board must not consist of any person who was a witness to the alleged misconduct of the inmate.

## MEDICAL CARE

Several of the plaintiffs testified that they were in need of medical attention and were denied such need by the jail authorities. They also testified that one of the inmates by the name of Cole was allowed to remain in his cell, although apparently suffering great pain, with the result that he died shortly thereafter.

██ The testimony of the plaintiffs, if believed, would entitle them to injunctive relief under the holding of the Sixth Circuit in *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir. 1972). The rationale of that case is that where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness of a prisoner held under color of law, denial of such need constitutes a deprivation of constitutional due process.

We find that the jail maintains a sick call which is available to all inmates, and that the sick call is staffed by paramedics who are either practical nurses, or, if male, were associated with the medical services offered by the military. In ad-

dition to these persons, the jail furnishes each day at least one physician, and on one occasion per week furnishes the services of a psychiatrist and a dentist. There is no showing that plaintiffs were ignorant of these facilities and of their right to be examined at sick call.

The testimony of Charles Terry with regards to his eye problem is somewhat illustrative of the testimony of the other plaintiffs. He testified that his eye condition was deteriorating for several months before he was in jail, but that he did not see a physician because he was a fugitive. He testified that he believed he was going blind and was denied medical attention by the jail, but the evidence offered for the defendants purports to show that Terry had an eye infection and was referred by the defendants to a physician for the purpose of having his eye examined.

With reference to the claim that Cole was callously denied medical attention, Vanderpool testified that the medical team brought Cole out of his cell and the police emergency unit was called. He was given artificial respiration and taken to General Hospital. Cole died two days later at General Hospital of a condition diagnosed as acidosis. We note that Vanderpool was subjected to searching cross-examination by counsel for plaintiffs on other subjects, but that he was not questioned concerning the Cole incident. We, therefore, accept his version of that incident and find that the inmates' testimony as to the callous indifference of Cole's condition is without persuasive value.

We have examined the other claims of the plaintiffs, that the defendants failed to provide needed medical attention for injuries or illnesses, and find them to be without persuasive value. In making this determination, we take realistic notice of the fact that many of the plaintiffs who testified are persons with extensive records who obviously have little regard for authority, law or persons in authority. We think it is a fair inference that there exists within them a bias not only as plaintiffs, but as inmates of many penal institutions, against their custodians and that this bias colors and diminishes the value of their testimony in all respects.

We hold that the plaintiffs have not proved by a preponderance of the evidence any violation by the defendants of the principles set out in *Fitzke v. Shappell, supra.*

## EQUAL PROTECTION

Plaintiffs claim that they are denied equal protection of the law because the facilities in the women's portion of the jail are superior to those in the men's portion. Apparently the facilities inhabited by the women inmates are cleaner, neater and more commodious and less custodial in their surroundings than are the facilities provided to the male inmates. Our attention is called to the fact that these facilities are for a much smaller inmate population than are the facilities for the male inmates, and that they are segregated from the male facilities. We do not know whether they were built at the same time the male facilities were, or subsequently, but do draw the inference that, insofar as cleanliness and neatness is concerned, the difference to a great extent apparently rests with the inmates themselves and not with the jail authorities.

If we were to assume that a valid equal protection question is presented by plaintiffs' argument, and we have been cited to no authority which so holds, the granting of injunctive relief would be out of the question, first because it would involve remodeling the male facilities at a time when it is contemplated that new facilities will be built for both male and female inmates which would render useless and extravagant any injunctive relief in this action.

We have this day entered a preliminary injunction in accordance with these findings of fact and conclusions of law.

## PRELIMINARY INJUNCTION

The Court having entered its findings of fact and conclusions of law and being fully advised in the premises,

It is ordered and adjudged that the defendants are enjoined from placing inmates in segregation for disciplinary infractions without first giving to them written notice of the rule which is violated, the right to a hearing before an impartial hearing board, and the right to testify and to call other inmates as witnesses, unless, in the defendants' discretion, the calling of such witnesses might create a risk of reprisal or undermine authority.

It is further ordered and adjudged that the defendants must personally deliver to the inmate a written statement, with a brief recital of the alleged facts, which constitute the infraction of the rule, and that the inmate be given at least 24 hours notice of a hearing before the disciplinary committee, and that any decision resulting in isolated segregation must be in writing and contain a statement of the grounds for the decision, and that a copy thereof be furnished to the inmate.

It is further ordered and adjudged that in the event of an emergency or crisis involving a threat to the security of the jail, the hearings referred to above may be deferred until the threat has subsided.

It is further ordered and adjudged that in the event of a riot, rebellion, mutiny or a strike, that the defendants are not enjoined from placing inmates in solitary confinement prior to the due process type of hearing mandated by this Court.

It is further ordered and adjudged with respect to classification of prisoners with their entry into the jail, that they be given an opportunity to appear before the classification board and to state their reasons why they believe they should not be assigned to administrative segregation or maximum security.

It is further ordered and adjudged that the regulation making it a disciplinary infraction to create a disturbance is held invalid because of vagueness.

It is further ordered and adjudged that the defendants supply to indigent prisoners who are filing in forma pauperis petitions in either state or federal courts the services of a notary public without requiring the payment of any fees.

It is further ordered and adjudged that the present limitations on visitation are invalid as being too stringent and overbroad, but that they may be continued in effect until the defendants submit to the Court new proposed rules as to visitation. Said new proposed rules must be submitted to the Court on or before February 1, 1976, and in the event that they are not satisfactory, the Court reserves the right to order specific rules as to visitation.

It is further ordered and adjudged that all the other claims of the plaintiffs presented in this action are without merit and that no preliminary injunction will be granted as to them.

## ON MOTION TO ALTER OR AMEND

This action has been submitted to the Court on the motion of the plaintiffs to alter or amend its findings of fact and conclusions of law entered on December 23, 1975. We will take up the various phases of the motion in the order they were presented by the plaintiffs.

### Sanitary Conditions

With regards to the sanitary conditions, the Court sees no reason to change its findings with respect to the supply of linens, soap and a change of clothing, the Court having based its findings on the testimony of the Associate Warden Vanderpool, and on its disbelief of the testimony of the inmates.

With regards to the vermin found in the jail, the Court does believe that its findings of fact and conclusions of law should be amended to provide that the living areas occupied by the prisoners be sprayed at least once a month.

With regards to the defective plumbing, there was testimony in this case and has been in previous related cases that much of the plumbing was

defective. Presumably much of this condition has been corrected pursuant to orders entered in other cases. However, the Court believes it would be appropriate to have a committee composed of three members, with the right to visit the present jail a minimum of once a month and not more than twice a month, to make certain that the plumbing facilities have been corrected, and that the inmates are receiving at least once a week clean clothes and bedding. The committee shall consist of three members, one to be appointed by the Legal Aid Society, one to be appointed by defendants, and a third member to be appointed by agreement of the Legal Aid Society and defendants.

If the parties cannot agree upon the third member's designation, they shall so notify this Court on or before March 15, 1976, and the Court will appoint the third member, provided that the parties supply him with lists of their candidates.

■ With regards to the mail, plaintiffs wish the defendants to stock their commissary with envelopes and stamps so that plaintiffs may have access to the courts. No constitutional authority is cited for this request and, as the Court pointed out in its previous opinion, each inmate in the jail, at least prior to his trial, has an attorney. Also, of course, the inmates are allowed visitors, and there is no reason why they cannot buy the necessary stamps and envelopes through their visitors or through their attorneys. While it might very well be preferable for the jail to stock such items, it is not constitutionally required.

■ With regards to regulations of the jail, plaintiffs maintain that the Court should amend its order with reference to regulations of the jail. The Court has examined the authorities pertinent to the request, and particularly *Meyers v. Alldredge*, 492 F.2d 296 (3rd Cir. 1974), and reaches the conclusion that the application of the vagueness principle is to be met by relaxing the standard somewhat in deference to the state's legitimate needs, rather than by

abandoning it. *Serratoni v. Chesapeake and Ohio Railway Company*, 333 F.2d 621 (6th Cir. 1974), cert. denied 379 U.S. 960, 85 S.Ct. 648, 13 L.Ed.2d 555; *Meyers v. Alldredge, supra*, at p. 311.

■ In light of those decisions, the Court refuses to alter its order insofar as it pertains to penalties to be imposed upon the inmates, except that with respect to placing inmates in indeterminate confinement in isolation, such decisions must be reviewed at least every ten days by a panel of officials, none of whom made the original decision to place the inmate in indefinite confinement. See *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974), at p. 431.

The other suggestions made by the plaintiffs that the defendants be enjoined for refusing to follow their own regulations is not backed up by substantial evidence, and the Court sees no need to enjoin the defendants in this regard.

Finally, with respect to visitation, the Court will incorporate the defendants' proposed visitation schedule, subject to the amendments provided for in a letter dated February 2, 1976 addressed by Betsey B. Swan to Joseph V. Mobley.

The Court has this day entered its amended preliminary injunction pursuant to this opinion.

### AMENDED PRELIMINARY INJUNCTION

The Court, having considered the plaintiff's motion to alter or amend its original findings of fact and conclusions of law, and being fully advised in the premises and acting pursuant to its memorandum opinion herein,

IT IS ORDERED AND ADJUDGED as follows:

1. The preliminary injunction previously entered on the 23rd day of December, 1975, and the findings of fact and conclusions of law entered on the 23rd of December, 1975, are hereby altered and amended in the following respects:

A. The defendants shall, as long as the present jail facilities are used for the detention of citizens, spray the cells of

all inmates at least once a month for the purpose of eradicating vermin and rodents.

B. A committee of three persons consisting of one member to be appointed by the Legal Aid Society, one member to be appointed by the defendants, and one member by agreement of the parties, shall be given the right to visit the jail unannounced at least once a month and not more than twice a month, in order to determine that the plumbing facilities are operating correctly, and that the inmates are given clean clothes, bedding and soap at least once a week. In the event that the parties are unable to agree upon the third member of the committee, they shall so notify the Court before March 15, 1976 and submit lists of proposed candidates, whereupon the Court will appoint the third member.

C. With regards to any sentences of indefinite confinement in isolation, a review of that sentence must be had at least every ten days by an impartial board whose members shall not consist of any persons who imposed the original indefinite sentence.

D. Visitation rights shall be granted in accordance with the proposed schedule submitted by defendants on January 29, 1976, subject to the following addition:

   If an individual is unable to visit an inmate because that inmate has already received his quota of visitors for the day, that person will be allowed to make an appointment to visit the inmate on the next day. All visitors from out of town may make an appointment to visit an inmate by calling the jail at least 24 hours in advance of the time for the visit.