**James RHEM et al., Plaintiffs,**

v.

**Benjamin J. MALCOLM, Commissioner of Correction, City of New York, et al., Defendants.***

**No. 70 Civ. 3962.**

United States District Court,
S. D. New York.

April 11, 1977.

---

* Because the funds to finance the City's proposal to reopen MHD were to be provided by the Federal Law Enforcement Assistant Administration, which had indicated that the money could not be held indefinitely pending decision, it was agreed that decision would be rendered by the end of December. It became apparent, however, that to meet an arbitrary deadline in preparing a written opinion on issues as complex and numerous as those before the court would require shortchanging the parties and the public. Accordingly, on December 22, 1976 the court announced and briefly explained its decision in open court. What follows is the written opinion promised at that time.

The Legal Aid Society Prisoners' Rights Project, New York City, for plaintiffs; William E. Hellerstein, Joel Berger, Michael B. Mushlin, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants; Donald J. Tobias, Alan London, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for State defendants; Margery Reifler, Asst. Atty. Gen., New York City, of counsel.

LASKER, District Judge.

In 1970 pre-trial detainees then held at the Manhattan House of Detention (MHD)[1] brought this civil rights class action challenging the constitutionality of conditions at the jail. On August 2, 1973 the court approved a consent decree which disposed of a number of significant issues and left others open for litigation. On January 7, 1974 after trial a decision was filed holding that various conditions and practices at the institution violated the due process and equal protection clauses. *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974). In March 1974, the City defendants were ordered to submit a plan to cure the unconstitutional conditions.[2] On July 11, 1974, the City having refused to submit such a plan, the defendants were enjoined from confining any person at MHD after August 10, 1974. 377 F.Supp. 995 (S.D.N.Y.1974). The order was made subject to reconsideration whenever the City submitted the required plan. On the City's appeal of the order of July 11, 1974, the Court of Appeals affirmed as to the finding of unconstitutionality and remanded for reconsideration of equitable relief. *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974). In December 1974, the City discontinued the use of MHD in preference to remedying the unconstitutional conditions noted by this court and the Court of Appeals. No person has been incarcerated at MHD since then.

The City now moves for an order pursuant to Rule 60(b)(5) and (6) Fed.Rules of Civ.Proc., modifying the order of July 11, 1974 to allow use of MHD as a general detention facility after completion of extensive improvements which the City proposes as compliance with the decisions of this court and the Court of Appeals. Because of

---

1. The Manhattan House of Detention and its predecessors have been historically known as "The Tombs." To avoid pejorative and lugubrious connotations we refer to it as MHD.

2. This order was entered after several conferences with the parties, proposals and counterproposals, and extensions of time to the defendants.

the public importance of the application evidentiary hearings were held on an expedited basis on November 13, 19, 20, 22, 23 and 24. The witnesses at the hearings were Edwin S. Bishop, Arthur J. Seckler, Jr., Frank J. Esposito, Ellis C. MacDougall, and Roberts J. Wright (testifying by deposition) for the City, and William G. Nagel, Elliot Paul Rothman, Frederic D. Moyer, and Dr. Raymond E. Gerson for the plaintiffs.[3] On

3. Since 1965 Edwin Bishop has been the Senior Acoustical Consultant to Cerami & Associates, Inc., an acoustical consulting firm. Before joining Cerami, he had been employed as an industrial application engineer in acoustical design and vibration control for air conditioners and refrigerators, and had responsibilities for design and field performance of acoustical products for various companies. A partial listing of Cerami's acoustical consulting projects include the Moscow World Trade Center; the National Gallery of Art; the Library of Congress; the Senate Office Building Extension, and Federal Home Loan Bank Board in Washington; Police Headquarters Building in New York City; the Marriott Hotel in Chicago and the Park Lane Hotel in New York; various broadcasting studios; high rise office building projects, including the World Trade Center in New York,—to name only a few.

Mr. Seckler is a partner in Brown, Guenther, Battaglia & Seckler, a well known architectural firm that has specialized in urban design problems: multi-use developments, air rights, housing, urban renewal, schools and colleges, hospitals. Mr. Seckler became associated with the firm in 1965, and in 1971 was made a full partner. He is a registered architect, and received his Bachelor's degree in architecture from the University of Notre Dame in 1961. The firm has done planning work for four other New York City jail projects, all on Rikers Island, and has received numerous design awards over the last two decades.

Ellis MacDougall is presently Associate Director of the Graduate Program in Criminal Justice at the College of Criminal Justice in the University of South Carolina. He has held numerous and diverse positions as a correctional administrator. Most recently, he was Acting Commissioner for the Mississippi Department of Corrections, helping to set up the new Department established by legislation which he had assisted the Governor's Office in drafting. He was Commissioner of the Department of Corrections and Offender Rehabilitation in Georgia from 1971–74, and before that, was Commissioner of the Department of Corrections for the State of Connecticut with responsibilities including supervision of the State's five prisons and nine jails. He is a member of various professional and educational associations, a member of the Editorial Board of *Criminal Justice Review,* and he assisted in drafting portions of the American Correctional Associations' Manual of Correctional Standards in 1966. He was a Commissioner on the National Advisory Commission on Criminal Justice Standards and Goals, and has served as a consultant to many states and localities.

Mr. Wright also has an impressive history in correctional work. He only recently resigned from his position as Commissioner, Department of Corrections of Westchester County, New York. He had served as a corrections officer and member of the classification staff in Massachusetts prisons in the 1930's, and was Warden at the Westchester County Penitentiary for four years. He was subsequently a Commissioner on the New York State Board of Parole for 8 years. He has been very active in professional associations, being the Associate General Secretary of the Correctional Association of New York and the American Correctional Association from 1934–56. He has served on numerous professional boards and organizations, including a stint as President of the American Correctional Association, and since his retirement has been serving as a member of the Governor's Advisory Commission on Corrections in the State of Maine.

Frank Esposito is the Project Manager for the Richard Hill Consulting Engineers, who are the subcontractors for electrical and mechanical engineering matters for the C94 plan. His experience as a mechanical engineer dates back to 1961, when he left the New York Institute of Technology after two years of training; he is familiar with the mechanical systems in the MHD, in particular, with the heating, ventilation and electrical systems.

Since 1961 William Nagel has been the Executive Vice President of the American Foundation, Inc. and Director of the Institute of Corrections of the American Foundation; these organizations work towards correctional reform by sponsoring studies of various aspects of correctional work and making them available to the public and to governmental bodies. Mr. Nagel was an Assistant Superintendent at the New Jersey Correctional Institution in Bordentown for 11 years, following which he was a consultant to the National Council on Crime and Delinquency, Coordinator of Human Services Activities for the Governor of Pennsylvania, then Executive Secretary of the Council for Human Services in the Governor's Office— among many other activities. He was a consultant to the President's Commission on Law Enforcement and Administration of Justice (1967), and a member of the Task Force on Corrections, National Advisory Commission on Criminal Justice Standards and Goals (1972). He has recently written the *New Red Barn: A Critical Look at the Modern American Prison,* a detailed architectural survey of over 100 jail

November 13th, the court, accompanied by counsel for the City and for plaintiffs and by William Nagel, an expert witness testifying in opposition to the City's motion, visited MHD to observe the areas in which the City proposed architectural changes.

The elaborate and impressive plan submitted by the City and prepared by the architectural firm of Brown, Guenther, Battaglia and Seckler, familiarly known as "C94", is intended to provide for contact visits between inmates and visitors, adequate inmate exercise and recreation, appropriate medical facilities, adequate heating and ventilation of MHD, elimination of excessive noise and window alterations which—in contrast to the opaque glass brick now in use—will "enable inmates to see the world outside" (City Memorandum of Law in Support of Motion at p. 10).

Judgment as to the adequacy of the City's proposals must start from the principles and findings established by the earlier trial and appellate decisions in this case. Affirming the views expressed by the trial court at 371 F.Supp. at 623, The Court of Appeals held that:

". . . [plaintiffs] are not convicted felons but are pretrial detainees, presumed innocent of the charges against them but imprisoned only for failure to make bail. . . . The demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners." *Rhem v. Malcolm, supra,* 507 F.2d at 336.

Moreover, since its affirmance of the decision of this court, the Court of Appeals has more recently held that:

". . . any deprivation or restriction of the detainees' rights beyond those which are necessary for confinement alone, must be justified by a compelling necessity." *Detainees of Brooklyn House*

and prison institutions in the United States. He received his graduate degree from the University of Pennsylvania School of Social Work in 1948, and has taught at Pennsylvania State University. He has testified as an expert witness before this court and other courts on many occasions.

Elliot Paul Rothman is an architect, who received a Master's Degree in City Planning and Urban Design from the Harvard University Graduate School of Design, where he later served as an Associate Professor of Architecture (1966–68). He is a member of numerous professional organizations, and received the 1972 Design Awards Citation from *Progressive Architecture* magazine for his design of the Middlesex County House of Corrections in Billerica, Massachusetts. Most recently Mr. Rothman's firm (whose partners are himself and his wife) served as the architectural and planning consultant for the renovation of the Suffolk County Courthouse in Boston, and as Program Consultant to the architects planning the new Suffolk County jail designed to replace the Charles Street Jail which had been ordered closed by the District Court of Massachusetts. See *Inmates of Suffolk County Jail v. Eisenstadt,* 360 L.Supp. 676 (D.Mass.1973). In addition to his work on correctional facilities, Mr. Rothman has experiences in the design and planning of medical and hospital facilities.

Frederic Moyer is also a registered architect. He received his Bachelor's Degree in Architecture from the University of Illinois in 1960 (with highest honors), and then studied at Princeton where he received a Master of Fine Arts degree. He has published numerous proposed master plans and guidelines for various state correctional and jail facilities, one of which *Guidelines for the Planning and Design of Regional and Community Correctional Centers for Adults,* has been published by the United States Government Printing Office. Mr. Moyer is a Professor in the Department of Architecture of the University of Illinois, and since 1971 has served as Director of the National Clearinghouse for Criminal Justice Planning and Architecture. The National Clearinghouse, under a technical assistance contract with the Law Enforcement Assistance Administration of the federal Department of Justice, evaluates and certifies correctional planning grant proposals as being, or not being, in compliance with statutory and administrative directives that all proposals to receive federal funding be in compliance with advanced standards. The Clearinghouse engages in research and technical assistance in the planning and design of criminal justice facilities across the nation.

Dr. Raymond Gerson is now a consulting engineer, specializing in energy, environmental and noise matters. He served as Director of the Bureau of Noise Abatement for the New York City Environmental Protection Agency from 1972–1975.

*of Detention for Men, et al. v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975).

Finally, in a later appeal in the instant case, the Court of Appeals ruled that the constitutional rights of detainees may not be tempered to meet the City's present fiscal crisis:

"We are not unaware of the financial difficulties presently confronting the city defendants. . . . an individual's constitutional rights may not be sacrificed on the ground that the city has other and more pressing priorities. See *Rhem v. Malcolm,* 507 F.2d at 341–42; *Detainees of Brooklyn House of Detention v. Malcolm,* 520 F.2d 392, 399 (2d Cir. 1975). To do so would be to discriminate grievously against poor persons who cannot afford bail. Presumed innocent in the eyes of the law, they are incarcerated solely to insure their appearance at subsequent proceedings. This limited deprivation of their liberty cannot be extended to justify the denial of other unrelated rights for budgetary reasons. See *Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Denial of the presumptively innocent detainee's constitutional rights represents an impermissible price to pay for his retention in custody." *Rhem v. Malcolm,* 527 F.2d 1041, 1043–44 (2d Cir. 1975).

These appellate observations were premised on the following affirmed findings of fact:

"1. Detainees at MHD are subject to maximum security conditions at all times.

2. MHD, like other pre-trial detention facilities, is capable of classifying inmates to determine those requiring maximum security custody.

3. Most detainees at MHD, as at other detention centers, can be safely held in custody in less than maximum security conditions.

\* \* \* \* \* \*

7. The levels of noise at MHD at all times except late night or early morning are unbearably high. Long term exposure to such noise can cause impairment of hearing, and even short exposure may increase tension and adversely affect mental health.

8. As a result of inadequate ventilation, heat at MHD is a burden in summer and at times even in cold weather. There are occasions in winter when heat is inadequate. These factors have adverse effect on mental and physical health.

9. Most detainees at MHD are unable to see out of the building. Such lack of contact with sun, sky, street or the outside world can result in psychological disorientation, especially in an institution in which a large number of detainees are held for a long period. Installation of transparent windows at MHD would not significantly increase security risks at MHD.

10. Physical recreation at MHD is limited to a maximum of 50 minutes per week in a small rooftop area and these limitations generally have an adverse effect on mental and physical health.

\* \* \* \* \* \*

16. The totality of circumstances at MHD have produced dismal conditions significantly inferior to those existing at New York State penal institutions and many other municipal or federal houses of detention." 371 F.Supp. at 620-22.

As indicated above, although the findings after trial in this case were affirmed, the Court of Appeals remanded for the district court to frame an order "to close the prison to detainees or to limit its use for detainees to certain narrow functions by a fixed date, unless specified standards are met. . . Once the appropriate standards or permissible limited uses are established, the court can then determine whether there has been compliance by the specified deadline." 507 F.2d at 340. The Court of Appeals specified that in framing its order, this court could invoke any of the following alternatives: 1) require that no pretrial detainee be housed at MHD after a fixed date unless it were upgraded to meet specified standards; 2) limit the use of MHD to particular purposes, such as temporary use for inmates actually on trial, or desiring to see

an attorney, and "establish minimal standards as a prerequisite even for limited use," or 3) order that no detainees be housed at MHD if, after a reasonable period, the court determined that the City could not or would not remedy the constitutional violations. 507 F.2d at 341.

Because the City decided to close MHD, this court has not had occasion before this to define objective standards as the Court of Appeals suggested. As a result, there is now presented the unusual task of measuring a detailed architectural proposal against the necessarily general findings after trial of the original decision, findings which while they determined in what respects conditions at MHD were unconstitutional did not purport to specify whether particular alternative conditions—such as those now proposed—would meet constitutional muster.[4] To aid the City in its future decisions concerning MHD, this memorandum reviews the C94 proposal not only to decide whether it remedies the constitutional violations previously found but also, where the plan is deficient, to set forth acceptable alternatives.

### MHD under C94

The C94 proposal originated in negotiations between the City and the federal Law Enforcement Assistance Administration (LEAA) through which it developed that $2.6–2.9 million dollars might be made available from LEAA for renovation of MHD. While the City has quite properly attempted to take advantage of these funds, it is relevant to note that the architects and planners have been constrained in their assignment by a monetary limit several orders lower than the $12–15 million amount which the City itself had previously estimated it would cost to bring MHD up to acceptable standards.[5]

4. It is worth noting that under the construction schedule proposed by C94, it would take at least 26 months from the time of court approval to reopen MHD with the proposed improvements. Court Exhibit 1, p. 11-1.

5. In the "shopping list" submitted in March, 1974 by the City Department of Correction to the Bureau of the Budget, (Exhibit B to Berger Affidavit), the estimated cost of necessary improvements if made on an unoccupied MHD

There is no doubt that if implemented C94 would represent a signal improvement of the conditions found to exist in this facility three years ago. The firm of Brown, Guenther, Battaglia and Seckler as well as its acoustical consultant, Edwin Bishop and its engineering consultant, Frank J. Esposito, deserve high commendation for imaginative work within the confines of the specified budget of $2.6 million. The C94 plan makes significant attempts to provide recreational and exercise space, to eliminate crowding, and in general to meet with the court's earlier rulings. On the other hand, C94 does not purport to go much beyond the minimal necessary to achieve such compliance, though there is of course no legal requirement that it should; the architects even filed a supplement to the C94 Report with recommendations for additional improvements should added funds become available. See Tr. at 2291 (Commissioner MacDougall) and Defendants' Ex. M. at 70 (Deposition of Commissioner Wright).

We proceed to discuss those parts of C94 which would achieve constitutional compliance.

Plaintiffs agree that the City's elaborate proposal to renovate the ventilation system of the building will eliminate problems in that area by assuring adequate air circulation to all floors. Plaintiffs also agree as to the sufficiency of the electrical rewiring and new lighting which has already been installed in MHD pursuant to ¶ 2(f) of the Consent Decree. (See Tr. at 1557) The plan also includes provisions for laundry facilities for inmates' clotheswashing on each floor, the adequacy of which is not contest-

was $5,870,000. and $7,631,000. to improve an occupied building. In June, 1974, the City Planning Commission, in a letter to the Chairman of the New York City Board of Correction, estimated that "to bring the existing facilities up to modern standards would require from $12 to 15 million and would reduce the capacity to 500 beds." (Exhibit D to Berger Affidavit).

ed, and the affidavit of Benjamin Malcolm, Commissioner of the New York City Department of Corrections in support of the City's motion states that MHD will be freshly painted before occupancy, an improvement which will contribute to overcoming the naturally dreary atmosphere of the building. Moreover, plaintiffs agree that the proposed medical facilities represent an adequate physical plant for the institution in accordance with the Consent Decree.[6] Finally, we find that the City's proposed contact visiting facility is adequate to meet minimal constitutional standards, as are the proposals to renovate the remaining booth visiting facilities. The parties agree that issues pertaining to the exact visiting schedule and the lock-out schedule are not to be decided in this proceeding.

*Areas of Dispute*

Several aspects of the C94 proposal are vigorously contested. Objections to the plan fall into three areas: (1) proposals to reduce noise and permit views outside the building; (2) proposals for recreation, program activity and exercise; and (3) absence of proposals for a classification system to eliminate holding all detainees in maximum security conditions.

## I. Physical Environment—Noise and Fenestration

■ The earlier finding that the physical environment of MHD was unconstitutional was based on the cumulative effect of the "dangerously high noise levels, excessive heat and inadequate ventilation and absence of transparent windows" which were found to exist. 371 F.Supp. at 607, 627. Although the City's plan provides for an adequate ventilation system, MHD will nonetheless remain quite hot during the summer, as would any steel and concrete building in the middle of Manhattan which is not air-conditioned. (Esposito, Tr. 2231) While this fact is of course not dispositive of the motion (nor do plaintiffs suggest that it is) it is an item to be considered in determining whether the C94 plan will create an acceptable living environment. See *Dillard v. Pitchess*, 399 F.Supp. 1225, 1229 (C.D.Cal.1975); *Johnson v. Lark*, 365 F.Supp. 289, 293 (E.D.Mo.1973); *Miller v. Carson*, 401 F.Supp. 835, 893 (M.D.Fla.1975).

*A. Noise.* MHD was found at trial to have noise levels constituting a "threat to hearing and mental health." 371 F.Supp. at 628. Plaintiffs' experts established that noise levels at 80 dba or more pose a real danger of hearing loss for those exposed to it over long periods of time, and that to eliminate risk, average noise levels should remain below 65–70 dba. *Id.* at 608.[7] At MHD, which experts testified was one of the noisiest correctional institutions in their experience, noise levels were found to average 83 dba in some parts of the residential floors. *Id.* at 608. Noise levels in certain areas were found to approximate those in the New York City subways. *Id.* at 607.

Plaintiffs agree that the C94 plan could achieve an 11 dba reduction in average noise levels, through acoustical treatment of ceiling and wall areas and through installation of low volume speakers for the television set. They disagree, however, with defendants' claim that an additional 3 dba reduction will result from reduced population levels, and argue that the City should take additional steps to further reduce noise.

Plaintiffs' noise expert testified at these hearings that an increase or decrease in 10

---

**6.** The Consent Decree required that the following physical changes be made in "the receiving area of MHD . . .

 A. Two of the existing showers shall be converted into individual examination cubicles.

 B. X-ray equipment shall be installed in the receiving area."

Consent Decree, page 7 (Exhibit A to Berger Affidavit). In addition, the Consent Decree required that various services and procedures be followed with respect to medical care; these issues are not before us.

**7.** Plaintiffs' evidence at the original trial was found to establish that "hearing loss is a real danger at decibel readings averaging 80 dba, and . . . noise levels should remain 10–15 dba below that level to insure safety." 371 F.Supp. at 608.

dba is perceived as a doubling, or halving, of noise levels. (Gerson, Tr. at 1664) Thus, even if plaintiffs are correct that C94 will only result in an 11 dba reduction, it would be a substantial improvement. The highest average noise level recorded at MHD in pretrial tests was the 83 dba average found in November, 1972 adjacent to the television set on the 8th floor; at the same time, readings for the A and B block on the 10th floor showed average sound levels of 73 dba. (Tr. at 1706) An 11 dba reduction would lower the highest average sound levels to 72 dba and would result in significantly lower noise levels in many parts of the institution.

Moreover, the conclusion of plaintiffs' noise expert that reduction in population will cause no reduction in noise levels is open to doubt.[8] Under the C94 plan, the maximum capacity of floors 4–9 will be reduced from 722 to 530, through removal of cells (which, incidentally, will decrease the number of highly reverberant steel bars per floor). Plaintiffs emphasize the fact that in July, 1974 when the institution's population had been lowered to 430, noise readings were lower than those taken in November, 1972 by a statistically insignificant amount. Plaintiffs' expert concluded that past reductions in population did not result in lower noise levels because the background noise level from other sources such as television was so high that diminution in "people created" noise had no impact. (Gerson, Tr. at 1672–80) Even if this analysis is correct, it does not follow that a reduced floor population would have no effect on noise levels in MHD if the acoustical treatment and low volume speakers proposed by C94 are installed. (Tr. at 1672) At the least, these changes will create a quieter level of background noise above which people would have to raise their voices to be heard. When there are fewer people on the floor, the perceived noisiness of the floor may well be less since there will be fewer people to create noise, whether of conversation, movement, or impact on the hard steel and concrete surfaces of the building.

For the foregoing reasons, we think it appropriate to credit the C94 plan with some part of the asserted additional 2–3 dba reduction in noise levels flowing from the reduced floor capacity. It follows that even in the noisiest areas of MHD, daytime noises will average no more than about 70 dba. Such a level, though at the high end, is within the range which plaintiffs themselves had earlier established as acceptable. See 371 F.Supp. at 608.

There is further reason why, even if no "credit" is granted for reduced population, the C94 plan goes far towards remedying the noise problem at MHD. Testimony at the original trial established that:

"The structure, so largely built of steel and concrete, is a natural for noise, a perfect soundbox in itself . . . 'it is the kind of building that you could drop a penny in and be the only person in the place and it would make a racket.' [Test. of Dr. Kinzel]" 371 F.Supp. at 607–08.

Defendants' noise expert and acoustical engineer testified that treatment of the walls and ceilings will not only reduce noise levels but will diminish reverberations thereby reducing the "confusing element of the noise, which is the most annoying part of it." (Bishop, Tr. at 2074).

We find that if C94 were implemented, there is a high degree of probability that inmates would no longer be living amid noise levels dangerous to health and hearing. Plaintiffs argue nonetheless that since pretrial detainees are entitled to be held

8. Dr. Gerson's predictions of the effect of various noise reduction techniques have proven mistaken in two respects previously. In April, 1974 Dr. Gerson was of the view that reductions in population at MHD would result in reduction in noise levels; for reasons set forth in the text above, he revised his views following tests conducted in the summer of 1974. See Plaintiffs' Exhibit 12 (Nov. 1972 Report of City Environmental Protection Agency concerning noise levels at MHD); Plaintiffs' Exhibit 5 (Dr. Gerson's testimony of April, 1974 before City Board of Corrections). Also in his 1974 testimony Dr. Gerson had stated that acoustical treatment of MHD would result in a 12–14 dba reduction; he now agrees with Mr. Bishop's conclusion that such treatment can only yield a 6 dba reduction.

under conditions amounting to the "least restrictive means" of securing their appearance for trial, if noise levels can be reduced even further by means consistent with the security interests of the institution, such reductions are required. Specifically, they argue that the C94 plan for noise reduction must be rejected because it does not provide for individual earphones or for plastic dishware at mealtimes.

Plaintiffs' Exhibit 9, a tape of mealtime noises recorded while MHD was in use and played for the court at decibel levels likely to result if C94 were implemented, makes it apparent that mealtime noises may still be obtrusive, unpleasant and jangling to the nerves. Although some of the unpleasantness may be mitigated by acoustical treatment which reduces reverberations and by keeping the serving carts at a distance from the dining tables, plaintiffs suggest that the din could be substantially alleviated by using vinyl-coated or plastic cutlery, trays and serving implements instead of metal ones. Defendants' noise expert agreed that this would reduce mealtime noise.

It is difficult to understand why the defendants oppose use of nonmetallic utensils at mealtimes. Use of such material would not only reduce noise levels, but security interests seem to militate in favor of using plastic, rather than metal, utensils. In at least one jail whose conditions were recently found to be unconstitutional, inmates complained of being terrorized by other inmates wielding weapons fashioned from metal cutlery. *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582, 590 (D.P.R.1976). Yet it is not a court's function to require particular details of a scheme if the proposal as a whole will reduce noise to constitutionally acceptable levels. We have found that it will do so.

Plaintiffs argue further that the dictates of equal protection, as well as the "least restrictive means" test, require the City to provide individual earphones to inmates at MHD, to hear radio and television programs, because earphones are provided to convicted New York state prisoners. The City's answer is that it would not be feasi-

ble to meet hygienic requirements for use of earphones in a facility with the rapid turnover rate of a New York City jail and that the low volume communal speakers proposed in C94 will adequately control noise.

In the March, 1974 "Shopping List" submitted by the City Department of Corrections to the Bureau of the Budget for items deemed necessary to "make the MHD a satisfactory institution with respect to all concerned," funds were requested to provide a speaker with individual control for each cell. (Ex. B to Berger Affidavit) This plan would avoid the hygienic problems of use of earphones by different inmates and simultaneously assure the removal of noise from residential quarters to a greater extent than does C94. Nevertheless, the issue is not what course is wisest but whether the C94 plan meets constitutional standards.

 The Equal Protection Clause mandates that pre-trial detainees may not be treated less favorably than convicted persons, except where a difference in treatment is related to a legitimate governmental interest. See *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Inmates of Suffolk Co. Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973). The need to maintain proper standards of hygiene is such a legitimate interest, justifying a difference in treatment. Although it is possible that the hygienic problems could be met by increased staff and expenditures, it is unnecessary to explore these questions in a detailed evidentiary hearing, because the equal protection standard, like the "least restrictive means" test, looks to the cumulative effect of conditions of confinement, and does not require exact equivalences in every detail of institutional life. Where overall conditions meet constitutional standards, and the particular condition or practice complained of is not health-threatening nor a direct restraint on liberty, a rational justification is all that is constitutionally required to support a minor difference in treatment. While the regular use of earphones in other institutions may suggest, as

a matter of policy, that they should be considered for use in the City jails, it does not establish a constitutional requirement.

*B. Windows.* In addition to being one of the noisiest jails in the country, MHD may be unique in another respect: its "windows" were designed so that inmates cannot see outside. (Tr. at 1592) As indicated in the 1974 opinion, the windows are made of translucent glass, with the result that inmates cannot see "human activity outside the building or even look at the sky." 371 F.Supp. at 610. Various experts testified at the 1973 trial as to the deleterious and disorienting psychological effects of being so cut off from observation of the outside world. Moreover, the 1973 record established that clear security glass was available and that the City had no policy objections to its use. 371 F.Supp. at 610.

In light of this record, we agree with the view of William Nagel, a nationally recognized correctional expert and author of *The New Red Barn: A Survey of American Jails*, that C94 represents an "extraordinarily minimal response" to the finding that the detainees' "inability to see the sun, sky or outside world" is a constitutional deprivation. (Tr. at 1588); 371 F.Supp. at 627.

C94 would replace a small portion of the tall "windows" at MHD (which extend from the lower to the upper tier on the exterior walls) with panels of transparent "glass brick." Although the diagram at page 7–1 of C94 (Ct.Ex. 1) indicates that inmates in both the upper and lower tier cells would have a full view of the glass brick from a standing position, in fact the cone of vision for persons in the lower cell has been incorrectly drawn, as Elliot Rothman, plaintiffs' architectural consultant and expert witness, testified. (Tr. at 1891) His testimony on this point was not disputed. Nagel also testified that in order for an inmate on the lower tier to have any view of the glass brick opening, he would have to crouch in the front of his cell. (Tr. at 1589) The court, visiting MHD in connection with the hearing on this motion, confirmed that the area designated for substitution of the transparent glass brick can be seen by inmates of normal height in the lower tier cells only by contorting themselves in the front of the cell. Accordingly, the transparent glass brick would be virtually useless in providing inmates in the lower tier with a view even of the sky.

Moreover, even for inmates on the upper tier or for inmates in the corridors, the transparent glass brick itself is inadequate. Frederic Moyer, an architect, Professor of Architecture at the University of Illinois and Director of the National Clearinghouse for Criminal Justice Planning and Architecture, testified for the plaintiffs that:

> "We have seen such installations in fact in jails and we are aware that vision through such material is distorted, and that while the transparency or translucency is perhaps greater than would be found there today, I don't think it would be accurate to claim that a view has been provided.
>
> It would be a view of the window, but not of anything beyond the window. The glass block distorts a lens effect, and the materials are not constant, and there is only vision at the core of the block and only if your eye is very close to it and even then there is distortion."[9]

Moyer's opinion in this regard was supported by Elliot Rothman, also an architect with experience in jail architecture. (Tr. at 1892–96) The glass brick, in short, will provide, as Nagel testified, nothing more than a "teasing" suggestion of the world beyond MHD. (Tr. at 1590).

The City's justification for the C94 glass proposal is not persuasive. Mr. Seckler, the City's architect, testified that because the view from the windows in MHD was not

---

**9.** Moyer commented further:

"My reference would be made to a jail which is built in Illinois in which a glass block was used by the architect with the best of intentions but not with the best of results. He intended that such a unit might serve as a vision panel for the surveillance staff who would be able to pass each line of rooms and look through the block and see if the inmate is in the room and we found that you could not tell this by looking through the glass block, on direct inspection. (Tr. at 1745–46)

particularly attractive and because the court's concern was primarily with the inmate's ability to see weather conditions, the small glass brick panes were an adequate response. (Tr. at 2174) Our earlier findings, however, were not limited to the ability to see weather or even the sky and sun alone, but referred expressly to "human activity outside the building." The City's engineer, Frank Esposito, testified that increasing the area covered by clear glass would make it more difficult, though not impossible, for the building to retain heat in the winter and remain cool in the summer. (Tr. at 2288) These problems are resolved in other buildings in which people work or live, however, and no reason was offered why they would be insuperable at MHD. (Tr. at 2231–43)

For these reasons, we find that the C94 proposal would not remedy the defects in the physical environment of MHD sufficiently to permit its use as a facility for the pre-trial detention of a general population. While noise levels would be tolerable they would be high; inmates would have little relief from summer heat, and virtually no relief from the inability to see the outside world, except that provided by exercise periods on the roof. (See part II(B), *infra*.)

## II. Recreation, Exercise and Program Activity

The 1974 opinion identified five deficiencies in the then existing facilities for inmate exercise and recreation: (1) inadequate opportunities for active physical exercise; (2) inadequacy of the lock-out corridor as recreational space; (3) deficient programmatic activity; (4) limited detainee employment and (5) a lack of optional lock-out time.

Plaintiffs maintain that C94 does not provide sufficient space for programmatic activity and for physical exercise. In particular, they object to C94's failure to implement the consent decree requirement that half of floors 5 and 8 be converted to use for programmatic activity and argue that use of the roof, supplemented by C94's proposed "mini-gyms" on floors 9 and 10, will

not provide sufficient opportunity for physical exercise. They also argue that because the roof has been enclosed, detainees will be afforded no opportunity for outdoor physical exercise.

Defendants contend that by eliminating, as C94 proposes, the E and F block cells on each of floors 4 through 9 to create a day room at the end of each floor, they have gone beyond the requirements of the Consent Decree with respect to floors 5 and 8; that the covered rooftop area provides adequate space for outdoor recreation; and that the rooftop facility will be supplemented, beyond what is required, by the creation of "mini-gyms" on floors 9 and 10 containing individual exercise equipment.

### A. Modification of Consent Decree

C94 proposes to remove all cells from the E and F blocks on every residential floor to be used by detainees, that is floors 4–9. (The third floor would be used as dormitory housing for sentenced persons, and the tenth floor as an overnight lockup area.) Removal of the cells will create a true dayroom at each side of the housing floors: the E block sections will contain between 700 and 753 square feet, and the F block section will contain between 874 and 935 square feet. (Ct.Ex. 1, 3–3). The E and F block areas will be enclosed by a plexiglass wall, as truly separate rooms on the floor to which inmates can move, away from their cells; they will contain ping pong tables, table games and lounge areas. (Tr. at 2173).

The E and F block dayroom space would alleviate the feeling of density and overcrowding on each floor, and would remove one of the sets of bars which create the oppressive and Bastille-like atmosphere at MHD. (MacDougall, Tr. at 2295; Nagel, Tr. at 1583, 1585). Moreover, their creation would compensate for the inadequacy of the lockout corridor for use as a dayroom. The existing lock-out corridor is not a dayroom, much less usable for "active recreation" as the C94 plan suggests; it is essentially a place to do "dead time," 371 F.Supp. at 612, in essence, a corridor. 371 F.Supp. at 612–

13, 621. Dayrooms are necessary and intended to provide relaxation space, an area outside of and away from the cells to which inmates can go for change of mood and activity during lock-out hours. (Nagel, Tr. at 1565, 1647–48). Where the cells themselves are as small as those at MHD,[10] adequate space on the housing floor for unprogrammed, relaxed time is essential. (Nagel, Tr. at 1565).

The issue before us, however, is not whether E and F block dayrooms are a good idea, or even whether they or an equivalent are a requisite for renewed use of the MHD, but rather, whether their creation should be permitted to relieve defendants of the requirements of Paragraph 2(c) of the Consent Decree entered August 2, 1973, namely, that cells on half of floors 5 and 8 be removed and the areas used for recreational and programmatic purposes. A consent judgment, like any other final judgment, may be modified under Rule 60(b)(5) but only upon a showing of "exceptional circumstances" arising from changed conditions which make it "no longer equitable that the judgment should have prospective application." *Mayberry v. Maroney*, 529 F.2d 332, 335 (3d Cir. 1976); 7 *Moore's Federal Practice* ¶ 60.26. The defendants have assumed the burden of showing that enforcement of Paragraph 2(c) of the Consent Decree would be inequitable or unfair due to changed circumstances. If the modification would work harm to the beneficiary of the injunction, relief will not be granted simply because the modification would accommodate the movant. 7 *Moore's Federal Practice, supra*, at 334.

Thus, the fact that it is more expensive to create dayrooms on each of floors 4 through 9 than to comply with the consent decree is not dispositive of defendants' motion to be relieved from the judgment, negotiated and consented to by the defendants three years ago.

The functions served by the E and F dayrooms, on the one hand, and the creation of recreational space on floors 5 and 8, on the other, while overlapping are not identical. Both would presumably provide space in which educational classes could be conducted. Both would provide space for additional "passive recreation" activities, or just for inmates to relax in an area away from their cells. The areas to be provided on floors 5 and 8 would, however, provide certain additional benefits which would not be afforded by the E and F dayrooms.[11] Recreation on floors 5 and 8 would permit inmates to spend a certain portion of their day in an environment visually removed from the pervasive caged effect created by the omnipresent bars on the residential housing floors. More important, creation of recreation areas on floors 5 and 8 would provide inmates with an opportunity to move off of the housing floors for program activity, an opportunity which was an important objective for plaintiffs in negotiating the agreement. (Berger Affidavit, ¶ 19).

Defendants suggest that the chapel and the library could be used for classroom spaces and other formal activities, to supplement the E and F dayrooms. Both the library and chapel facilities were available at the time the Consent Decree became effective, and at the time of the earlier

---

10. "Most cells are 4′10″ wide by 7′11″ deep (Stipulation of Facts # 2) or about 5,500 square inches. The American Correctional Association Manual of Correctional Standards (1971) . . . specifies minimum cell size of 50 square feet (7,200 square inches)." 371 F.Supp. at 600.

11. Of course, the E and F dayrooms would provide opportunities for relaxation on the floors not contemplated by the Consent Decree provisions; the issue, however, is whether the Consent Decree conferred benefits on plaintiffs not conferred by C94.

(Although the Consent Decree had specified that:

"Cells will be. removed from one-half of the eighth floor and one-half of the fifth floor to provide additional space for inmate programs and quiet recreation no later than June 30, 1974 . . . ."

plaintiffs are prepared to agree to a modification of this provision to the extent that one floor could be converted to an indoor gymnasium.)

findings concerning the inadequacy of recreational and program space at MHD. The possible availability of these facilities is therefore not a "changed circumstance" on which defendants may rely. In any event, use of the chapel would necessarily be limited at least until the pews—now bolted to the floor—are rendered moveable (MacDougall, at 2305), and use of the library for programmatic activity is obviously limited by the need to use it as a library. (Moyer, at 1838).

Moreover, the weight of the expert testimony is that C94 would not provide sufficient space for programmatic activities. Both Frederic Moyer and William Nagel testified that without conversion of floors 5 and 8 as specified in the Consent Decree, the institution as modified by C94 would contain inadequate program space for general detention population. (Tr. at 1580, 1834, 1838). Commissioner MacDougall's testimony that the E and F block dayrooms together with the library and chapel would provide sufficient program space was based on his own concepts of jail administration which the City has not incorporated as part of its proposal.[12] (Tr. at 2275–77, 2294–97). Commissioner Wright's testimony that the plan would provide adequate programmatic space seems to have been based on the mistaken belief that the 3rd floor would be used as a classroom area (rather than for dormitory housing for sentenced prisoners, as is the case). (Wright Deposition at 42). ■ We find, therefore, that the defendants have not shown that it would be inequitable to require compliance with paragraph 2(c) of the Consent Decree. The purposes to be served by the E and F block dayrooms are substantially distinct from those of the conversion of floors 5 and 8; and no inequity in enforcing the original judgment has been demonstrated. Even if

this were regarded as a motion under Rule 60(b)(6) to modify a judgment for "any other reason" justifying relief, defendants have not shown a sufficient justification for their being relieved of an obligation voluntarily undertaken, approved by the court prior to trial, and even posted in the institution for all class members to read over three years ago.

### B. Daily Outdoor Exercise

■ Pretrial detainees are normally entitled to one hour of outdoor physical exercise daily. *Rhem v. Malcolm*, 389 F.Supp. 964, 972 (S.D.N.Y.1975); *Miller v. Carson*, 401 F.Supp. 835, 891–92 (M.D.Fla.1975). Defendants' plan proposes to meet this requirement by use of the rooftop at MHD which, pursuant to the Consent Decree of 1973, has already been covered with a permanent, clear enclosure for year round use, and two "mini-gyms" to be created in the lockout areas in the center of floors 9 and 10. Plaintiffs criticize the C94 plan for physical exercise on the grounds that it provides insufficient opportunities for physical exercise and *no* opportunities for *outdoor* physical exercise.

We deal first with the latter contention. In accordance with Paragraph 2(A) of the Consent Decree, the City has already expended $375,000. to enclose the roof of MHD with with a clear plastic covering. The purpose of this improvement was, of course, to make the rooftop available for physical exercise year round. Plaintiffs argue, and several of their expert witnesses testified, that exercise on the rooftop would not be outdoor recreation, and urged that the City be required to provide additional space for outdoor exercise.[13]

The City contends first, that the peculiarity of the location of MHD excuses the City

---

12. For example, Commissioner MacDougall suggested that MHD be divided into different "units" each of which would be separately run by its own "manager" who could vary program activities and recreation according to the needs and desires of the unit. (Tr. at 2275–77).

13. Plaintiffs made two suggestions of how the City could provide complete outdoor recrea-

tion. Architect Rothman suggested that an outdoor area be constructed above the open vehicle loading area at MHD (Plaintiffs' Exhibit 13); William Nagel proposed using an undeveloped plot of land (currently a parking lot) across White Street from MHD. for outdoor recreation.

from providing true outdoor recreational facilities, and second, that in any event the enclosed rooftop is roughly equivalent to an outdoor recreation area. The argument that MHD's location in a heavily populated area where land is expensive excuses the City from providing outdoor recreation has been rejected. See *Rhem v. Malcolm, supra* 507 F.2d at 340; *Rhem v. Malcolm*, 396 F.Supp. 1195, 1198 (S.D.N.Y.1975).

It is true that on the enclosed roof at MHD, inmates will not be exposed to open air exactly as they would be in a true outdoor space. However, untreated outdoor air can be circulated on the roof. (Tr. at 2216). Moreover, the clearness of the enclosure permits a user of the roof to see open sky, sun and clouds. Thus, the rooftop can be fairly regarded, at least on an experimental basis, as substantially equivalent to an outdoor recreation area, since the only element of true outdoor recreation that is lacking is the ability to feel the natural air flow.

There remains the issue of the adequacy of the spaces involved to provide opportunities for active physical exercise. The question has two parts: how many inmates can actively use the proposed recreation areas and how many inmates will want to do so.

Under C94 a maximum of 530 detainees would be housed on floors 4–9. They would be divided into six groups of 88, each of which would be afforded an hourly recreational period five days a week. We find that the proposed schedule would allow sufficient time actually to transport the groups to and from the roof between periods, so that inmates would enjoy a full hour of recreation.

At each recreation period, an inmate would have a choice of being on the roof or in one of the two mini-gyms to be created on floors 9 and 10. The mini-gyms, which would contain individual exercise equip-

ment, are between 800–989 square feet large.[14] Although defendants' witnesses testified that up to 30 people could exercise in each of these rooms at once, plaintiffs' experts stated that no more than 10 persons could be accommodated at any one time. The architects' drawings for the C94 plan show 7 people exercising in the mini-gym. Observations of the space for the proposed mini-gym made during court visits suggest that the actual number of persons who could make use of each mini-gym is closer to the figure suggested by the plaintiffs than that put forth by defense witnesses. The limitations of square footage when actually viewed prompt our conclusion that perhaps no more than 10–12 persons can make use of each mini-gym at one time. Of course, any conclusion on the point, including this one, is necessarily preliminary. The only validator will be actual experience and use. In the meantime, however, the court must rule. Assuming that no more than 10–12 persons can make effective use of the mini-gyms at each time, then of the 88 persons in each group, 20–24 could exercise in the mini-gym and the remainder, 60–68 would be left to use the roof.

However, it was earlier found that no more than 24 persons could engage in active recreation at any one time on the roof, which has facilities for group sports such as basketball and volleyball. 371 F.Supp. at 611. An express finding was made that when 60 men were on the roof at one time, "36 to 40 men using the roof will not get any exercise, or, if the opportunities are shared, that every man will get considerably less than 50 minutes of exercise." *Id.* Thus, if all 88 persons wanted active recreation at the same time, the facilities would not accommodate them.

The City argues, however, that the number of inmates actually desiring to use the roof or mini-gyms for active recreation on

---

14. The C94 report indicates that each of the mini-gyms contains 981 square feet. Court Exhibit 1 at 3–3. Examination of the sketches of the areas in question according to the scale indicated in the report at page 3–5 indicates that the total area is closer to 912 square feet (dimensions 38 × 24 feet). On the court visit to these areas conducted on November 13, 1976 in connection with hearings on the instant motion, it appeared to be the case that up to four feet of the width of the mini-gym would have to be used as a corridor and would not be available for recreational space.

any given day would be small enough so that the roof and mini-gyms could actually afford that number one hour of active exercise daily. In support of this position, defendants rely on the testimony of Commissioners Wright and MacDougall that only one-third of the inmates would actively choose to exercise on a given day, and on a formula, set forth in the *Nebraska State Bar Association, Proposed Standards for Local Criminal Detention Facilities* (Defendants' Exhibit D) (hereinafter "Nebraska Standards"), for computation of how much outdoor recreation space a jail requires to meet acceptable standards.

Commissioner Wright and Commissioner MacDougall each estimated that only one-third of the general detention population would make use of active recreation facilities at any given time. (Wright Deposition at 24; Tr. at 2303); (If the estimate is correct, only 30 people in each group would be expected to engage in active recreation each day.) Commissioner Wright explained that:

"Generally in a detention center . . . there are many built-in factors that would limit the use of a recreation area. Of necessity a certain percentage of inmates would be required to be present in court on any given day. Visits would occupy their time. Possible voluntary work assignments would likewise occupy their time. Their participation in program activities do likewise. . . . Inmates generally do not all have the same recreational interests."

His estimate was:

"based upon observation and checking of this very factor in institutions which I have operated. We as a matter of fact had been surprised that in the Westchester County situation, in developing recreation areas, that their use was not more fully utilized. [sic] I think this too depends on age levels of inmates confined, because it's only obvious that the older an inmate becomes, the less physically active on a general basis he is." (Deposition at 25)

Defendants correctly point out that these estimates were not challenged on cross-examination nor contradicted by other expert testimony. If it were established without question that only one-third of each group of 88 would engage in active recreation each period, C94's proposals for physical exercise would apparently be adequate (at least experimentally). It is reasonable to assume that at least some of the persons desiring to engage in active recreation would prefer to do so in the mini-gyms which would contain popular exercise equipment not available on the roof. (Nagel, Tr. at 1574). Since 24 of each group of 30 (i. e., 1/8 of 88) would be able to exercise on the roof, it would be proper to permit the City to proceed with the plan, on the reasonable assumption that everyone desiring to engage in active recreation on the roof will be able to do so.

Nevertheless, the evidence that only one-third of each eligible group (i. e., 30) will wish to engage in active recreation each period is not persuasive. Although deference is to be accorded to the estimates provided by defendants' experts, particularly since their estimates coincide, it is important to review the factors which Commissioner Wright, for example, outlined as affecting participation: court appearances, work assignments, program activities, visits, age of population, and inmate preference. Presence in court on a given day may vary, and court appearances may vary from one jurisdiction to another. No evidence of the actual rate of court appearances among detainee populations in New York City was submitted. There is no indication that detainees at MHD will have voluntary work assignments available to them, nor of the nature or extent of "program activities." As to visiting, the proposed schedule would limit each inmate to two one hour visits per week; it is unclear whether Commissioner Wright assumed this rate of visiting in making his estimate. Finally, there was no evidence presented comparing the age group in New York City detention facilities to age groups in other such facilities.

Plaintiffs' expert witnesses agreed that 100% utilization of recreational facilities

would not occur. (Tr. at 1630, 1934). Nagel, however, stated that:

"I can't make a reasonable assumption [about likely use rates]. I would have to make a study of the age and the—
Q. If I broke it down for you and I say the age was between 18 and 32 predominantly, would you be able to tell the Court anything . . .
A. I would be hesitant. It would be such a wide guess that it would be practically useless. The younger the population group, the more larger use of recreation facilities you would have. Also, it would depend, I suppose, on geographical factors. I am not sure, for example, whether New Yorkers . . . would ordinarily use more or less than a country guy . . . If you want me to make a wild guess, I could make one, but it would—
Q. I don't want you to make a wild guess.
A. Then I would rather not answer."
(Nagel Tr. at 1631).

As suggested by this answer, too little is known of the comparability of the New York City detention population with those on which defendants' experts based their estimates for their opinions to be accorded conclusive weight. No evidence was submitted concerning recreation participation rates at other city institutions.[15] Without establishing a firm factual basis as to likely usage rates the City has not demonstrated its premise that only one-third of each group of 88 would desire to engage in active recreation each day.

In the alternative defendants rely on the Nebraska Standards for outdoor recreation space at detention facilities. Defendants maintain that the rooftop area at MHD more than meets the space requirements of these standards, which were described by plaintiffs' witness William Nagel, as "written with an idea of respect for the law and not just . . . respect [for] security

. . . realistic . . . mov[ing] toward a new level of requirements in jails." (Tr. at 1650). The Nebraska Standards prescribe that as a "minimum" every inmate over 16 years of age have one hour per day of outdoor exercise and recreation and that:

"If outdoor exercise is taken in a specified place, it shall have an area of nine hundred (900) square feet or

$$\frac{80\% \text{ of facility [population] capacity}}{\text{No. of one hour exercise periods per day}} \times 50 \text{ sq. ft.}$$

whichever is larger." (Nebraska Standards, 33–9(c).)

Since the rooftop at MHD has 4,150 square feet, defendants claim that the Nebraska Standards are met, on the basis of the following calculations: Eighty percent of the capacity of floors 4–9 (530) is approximately 420. This figure divided by the 6 exercise periods to be provided yields 70, which when multiplied by 50 square feet yields a requirement of 3,500 square feet.

The difficulties in relying on this formula, however, are substantial and have not been overcome by defendants' presentation. There is no evidence of record to show the empirical basis for the formula, or the assumptions on which it is grounded. It is susceptible of numerous interpretations. At least one reasonable interpretation and one which we find persuasive, is that a facility must plan on 80% utilization of a recreational facility by each group scheduled for each exercise period, and that the facility must allow at least 50 square feet per person.

Whatever interpretation is correct, we cannot agree with the results yielded if the formula intends to suggest that, for example, 70 people (i. e., 80% of 88) on the MHD roof will be able to engage in meaningful exercise at the same time. Repeated visits to MHD both when it was in use and since its closure have convinced us that the roof

15. Even if evidence of such usage rates were submitted, moreover, there might be questions whether a low usage rate resulted from overcrowding in available facilities. To the extent that low usage was explained by such overcrowding, it would be improper to consider the usage rate in determining the question of the adequacy of proposed spaces.

area is insufficient to accommodate any number approximating 70, even if not all inmates in the group of 70 desire to engage in active exercise.

Thus, without a meaningful explanation of the Nebraska Standards, formula, defendants' interpretation of it cannot be relied on to justify the C94 proposals for exercise and recreation. We note, moreover, that a reasonable interpretation of the formula implies that an institution should assume an 80% usage rate of its exercise facilities. If this is correct, the defendants' burden of establishing the adequacy of recreational spaces at MHD is greater.

■ A further factor which supports the conclusion that defendants have not sustained the burden of proving that every inmate will receive one hour of active recreation daily is C94's apparent failure to take into account the recreational needs of the sentenced population who will be living on the third floor.[16] Indications are that 70–100 sentenced inmates may be housed at MHD under the C94 proposal. Thus, even under the Nebraska Standards it is necessary to regard the institution's capacity as 600–630 rather than as 530. If the population of MHD is taken as 600, the roof would barely contain enough space to satisfy the Nebraska requirements; if the number were 630, it would not.

Without more reliable information, then, as to the actual experience of inmate use of active recreational facilities in comparable institutions, and the intended capacity of MHD as a facility, the C94 plan for outdoor

exercise cannot be approved.[17] It is worth noting, however, that if the population of floors 4 through 9 were reduced to under 400 (which would be nearly accomplished if the defendants incorporated into C94 the Consent Decree requirement that half of floors 5 and 8 be converted to program space by removing the cells) the proposal for physical recreation might approach acceptability, even assuming an 80% usage rate. However, given the City's proposal of a detainee population of 530, (augmented by a sentenced population of 70–100) who may reside at MHD for months before trial, the C94 proposals for active and outdoor recreation do not meet constitutional standards.

### III. Maximum Security

■ The discussion above makes it apparent that, in spite of shortcomings, C94 constitutes an impressive and commendable effort by the City to cure deficiencies which this court and the Court of Appeals have earlier noted. The effort deserves particular praise in light of the massive fiscal problems with which the City is faced. Subject to rectification of C94 as to fenestration, adjustment as to the plans for exercise and recreation, and provision of adequate staffing (see 371 F.Supp. at 628) C94 might be found to accomplish its objective were it not for a critical and fatal defect of omission. That defect is the total failure to eliminate or reduce conditions of maximum security for those detainees who need not be held in such harsh conditions either to assure their appearance for trial or the se-

16. As Plaintiffs' Exhibit 13, a "Review of Study Report C94 (November 10, 1976)" prepared by the architectural firm of Rothman & Rothman, notes, "[t]here is no discussion [in C94] of floors 10 and 3 . . . . The Study report [C94] fails to account for occupancy of the 10th and 3rd floors which will continue to effect the density of the building and impact on overall space standards for the total building." Exhibit 13 at 1. The Rothmans indicate that the third floor has a rated capacity of 94 people; with the 530 cells on floors 4–9, the institution would be housing as many as 624 persons other than those held in the 10th floor lock-up area.

17. Although the idea of creating indoor active recreation space is to be commended, it is not appropriate to attach any considerable weight to the availability of the mini-gyms on floors 9 and 10 in evaluating the adequacy of an outdoor recreation program. To the extent that people choose to recreate in the mini-gyms because the roof is crowded, rather than because they prefer the equipment in the mini-gyms to that on the roof, their right to outdoor exercise is prejudiced. If, in our view, the space on the roof came close to providing sufficient recreation space, we would reasonably assume that a certain number of those desiring active recreation would freely choose the mini-gyms. See pp. 38–39, supra.

curity of the institution. On this subject the original trial opinion observed at some length:

"We have found that MHD is capable of classifying inmates to determine those who do and do not require maximum security custody and that most detainees can be safely held under less restraint. It follows that the rights of the latter group are abridged by being held in maximum security [because] the conditions of their incarceration do not . . . 'cumulatively, add up to the least restrictive means of achieving the purpose' . . ."

\* \* \* \* \* \*

"It follows that defendants are obligated to eliminate or modify those features of maximum security at MHD which are not necessary for the safety of the institution or to assure appearance of detainees at trial. The first step in this regard must be the establishment of a classification system to determine those who do and who do not require maximum security custody. In requiring such relief, we join a parade of other federal courts which in recent years have imposed similar provisions in order to protect the constitutional rights of detainees. *Bishop v. Lamb,* Civ. LV, 1864 (D.Nev.1973); *Obadele v. Mc-Adory,* Civ. Act 72–J 103(N) (S.D.Miss., June 19, 1973); *Hamilton v. Landrieu,* 351 F.Supp. 549, 552 (E.D.La.1972); *Taylor v. Sterrett,* 344 F.Supp. 411, 423 (N.D. Tex.1972); *Brenneman v. Madigan, supra,* 343 F.Supp. 128, 131 (N.D.Cal.1972); *Hamilton v. Love,* 328 F.Supp. 1182 (E.D. Ark.1971); *Jones v. Wittenberg, supra,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom., *Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972)." *Rhem v. Malcolm,* 371 F.Supp. at 624–25.

The Court of Appeals specifically affirmed this holding:

"The reference to classification underlines one of the key issues on appeal. If it is possible to identify those detainees who are potentially violent or are likely to try to escape, it is quite clear that the constitutional rights of the much larger group of non-dangerous inmates are violated by the maximum security conditions of the Tombs."

It is important to specify what is meant by "the maximum security conditions" at MHD.

Mr. Nagel's testimony accurately describes the MHD cells (Tr. 1540):

"For the person who occupies the cell, you are within three solid pieces of steel with a cage front, an open grilled front beyond which there is another open grilled front, and beyond which, in some cases, I believe, there is a third open grilled front. So, as you are in your cell, the only vision you have of the world is three sets of grilles, cage-like grilles, then a wall, a wall that has opaque windows. The light—you see the light, but you see no objects, so from your cell—the only object you see from your cell are grilles, bars, bars, bars, bars, that is all. That is the effect of an inside cell."

The photo reproduced below and found at p. 790 of Court Exhibit 1 (C94) [18] gives a clear idea of the cell structure on the 9th floor of MHD.

As Mr. Nagel put it:

"In my professional experience, having toured over 100 jails, I can safely say that the Tombs is one of the worst institutions I have ever observed. I have seldom if ever seen such a pervasive cage-like atmosphere of steel and concrete in any other jail anywhere in this country."

Yet in spite of this court's finding that the rights of the majority of persons detained at MHD were violated by being unnecessarily held in such maximum security conditions, and the precise affirmance of that ruling by the Court of Appeals, on this motion the City makes no proposal whatever to alleviate the maximum security conditions at MHD or to classify inmates to determine in what cases such detention is or is not justified. This defect goes to the heart of the matter. It cannot be remedied

18. See Appendix.

by the improvements contained in C94, worthy as they may be.

In Mr. Nagel's view:

"7. The housing design of a jail is the primary contributor to the detention experience. Under the City's proposal, nothing is promised to change the fortress-like nature of the Tombs which subjects all detainees to maximum security confinement.

"8. The city's plan would continue to house all detainees in cage-like inside security cells. This type of accomodation [sic] is, by definition, maximum security. Thus, the court's requirement that most detainees be held in non-maximum security confinement is violated by the city's proposal." (Affidavit November 10, 1976, p. 2.)

The other principal witnesses on this subject supported Mr. Nagel's opinion. For example, Frederic D. Moyer testified that:

"Q Is it your view that under the C94 report the Tombs would be an acceptable institution for general detention?

A No, it would not, in our view, be acceptable.

Q Does the C94 plan implement any non-maximum security housing accommodations at the Tombs?

A It doesn't.

\* \* \* \* \* \*

Q Will you explain the reason for that answer?

A The proposal is unaccompanied by the conditions of occupancy that would suggest it might be short term. The contents or the substance of the recommendations, physically, architecturally, bear great similarity to those generally made by us last January, but ours were made under the condition of lock-up or overnight type of holding use, in essence. I don't find that condition to be accompanying this document. It appears to be for the purpose of general detention. The difficulty we find—among them, I might add, is the fact that the cells are interior in their location, that the improvements to the windows that are proposed which would purport to provide a view we would suggest do not provide a view, for a couple of reasons I can go into in more detail later, that the cell sizes in the vicinity have slightly less 45 square feet whereas the funding for any Part E funding is 70 square feet, as it is in a variety of other standards to which we could point which are not particularly applicable to this project but nevertheless prevail.

We find it not to meet such standards. We also find that the recreation spaces provided would be inadequate for an extended stay, as a general population could be expected to have, both in quantity and location in terms of accessibility."

\* \* \* \* \* \*

"Q Is it your testimony that if and when you are asked by LEAA to rule upon the Brown-Gunther plan [C94] that for general detention you will disapprove it?

A That is correct." (Tr. at 1741–42 and 1773).

Moreover, even defense witness Ellis C. MacDougall testified that if inmates were locked in their cells at MHD 14 to 16 hours a day (as was the case prior to its closing and as we must assume, in the absence of any indication to the contrary from the City on this motion, might be the case in a reopened MHD) "That would be a maximum security program and I would be shocked if minimum security inmates were locked up that much," (Tr. 2371) and again (at Tr. 2372):

"Q If I were to tell you that the lock-in program for New York facilities was a 14 to 16 hour lock-in, just as I described, would you characterize the operation in New York City detention facilities as maximum facilities?

A I would have to."

Furthermore, defense witness Robert J. Wright's recommendation that MHD be used as a short term facility for people awaiting arraignment and those who "can reach trial status within three, four, [or] five months" seems to be predicated on recognition of the harshness of maximum

security conditions at MHD. (Deposition at 75, 101).

Finally, it is worthy of note that the Board of Correction of New York City, a body appointed under the City Charter by the Mayor to monitor City correctional facilities, has, in connection with this application by the City advised the court that:

"In our judgment, any plan for a reopened Tombs should contain firm commitments both to have a classification system and to vary the conditions in which inmates are housed according to it. Although the provision of dormitories, outside rooms or other alternatives to the existing inside-cell configuration would be by far the most desirable way to achieve housing of varying security grades, we recognize—as we explained in the portion of our 1974 report attached to this letter—that much can be done within the existing configuration. A final plan for reopening the Tombs should spell out in some detail both the classification system that would be applied and how the varying grades of housing would work. Also, a ceiling on the total population along the lines already discussed would allow greater flexibility in providing housing alternatives." (Letter of December 14, 1976, Peter Tufo, Chairman, Board of Correction)

The absence of any proposal by the City on this motion to reduce maximum security at MHD is all the more surprising not only because all witnesses on the subject have agreed that classification in jails (though more difficult than in prison, because detainees are generally held for shorter terms than convicts) is feasible[19] (as this court and the Court of Appeals have found), but also because suggestions for alleviating the maximum security conditions at MHD in spite of the difficulty of modifying its structure have been offered by responsible officials. For example on January 15, 1976, Frederic Moyer wrote the Law Enforcement Assistance Administration (with a copy to the City) suggesting that variations (suitable for classification of inmates) be made in floors which would house detainees "who are within 20 days of a scheduled court appearance" from the floor which would house those to be held 24 hours only, providing day room space for the former and not the latter. (Plaintiffs' Exhibit 10, at 6).

More to the point is the fact that as long ago as April 29, 1974 the Director of Legal Affairs of the City Department of Correction wrote to the Corporation Counsel of the City setting forth at length plans for a program to train its personnel to classify inmates, a program which has since apparently been abandoned (Exhibit C to Affidavit of Joel Berger in opposition to motion).

The City argues that the fact that inmates at MHD were and would be held in cells (the bars of which resemble cages) should not alone define conditions at MHD as maximum security, as plaintiffs contend. The argument misses the point. This court and the Court of Appeals have already held that such circumstances do amount to maximum security when detainees are locked in their cells each day as long as they are at MHD. The City's plan does not indicate any change in such conditions. It does not suggest either that all inmates will be free to move within the institution or that a classification system will be created to decide who shall be free to do so. The issue before us is not whether holding a detainee in a cell is, by itself, unconstitutional, as going beyond the least restrictive means necessary to assure his appearance at trial and the security of the institution. The issue is whether the City's proposal meets the requirements of this court's decision at 371 F.Supp. at 624–25 as aff'd at 507 F.2d at 338. It does not, because it fails altogether to offer a plan for holding in maximum security only those detainees who constitute a threat to the security of the institution or who would not otherwise appear for trial.

19. See 507 F.2d at 341; Plaintiffs' Exhibit 10 (Letter from Frederic Moyer to Jules Tesler, Regional Administrator of LEAA).

For these reasons, the City's motion must be denied.

## IV. The Desirability of Use of MHD

In the unusual posture of this unusual case an afterword is appropriate. MHD has been and can again be a usable asset of the City. The court and the parties have an obligation to the community to decide under what conditions it can be used. To determine that the improvements proposed by C94 are not adequate to support a motion to renew its use as a facility for general and indefinite detention of prisoners does not compel a finding that the building, so improved, would not meet constitutional muster for limited use. The constitutionality of physical conditions of imprisonment is to be measured not in the absolute alone but also in relation to the period of time for which particular conditions are imposed on an inmate. See *Sostre v. Rockefeller*, 312 F.Supp. 863 (S.D.N.Y.1970), *aff'd in part, sub nom., Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

Although the issue has not been presented by either party on this motion, it is in the interest of the community to express the opinion that MHD as improved in accordance with the C94 proposal would be constitutionally adequate for short term, limited use as a lock-up or holding area for those whose trials are impending or in process or perhaps for those who knowingly consent to be housed at MHD in preference to being detained at other City facilities. Such use of MHD would benefit detainees, who would be closer to their families and counsel than they presently are; the state courts, by eliminating delay caused by transportation to the courts; and the bar, by improving the opportunities of lawyers to defend their clients. The limited utilization of MHD until funds are available to bring it up to constitutional standards for all purposes is not a chimera or fanciful suggestion. It is consistent with the decision of the Court of Appeals in this case. It has been supported by the National Clearing House on Criminal Justice Planning and Architecture as well as the New York City Board of Corrections and the New York State Commission of Corrections. As the State Commission observed in its letter report to the court dated January 18, 1977:

"The absence of a pretrial detention facility in Manhattan gives rise to a number of substantial hardships including:

. . . difficulties in communication between prisoners and their legal counsel;

. . . inability of families to obtain frequent access to prisoners due to the location and inaccessibility of Rikers Island;

. . . constraints on the processes of criminal justice system with respect to the transportation of prisoners to and from the courts on a daily basis.

Given these and other concerns, the provision of detention space in Manhattan is of the utmost urgency."

The parties are under an obligation to the public to canvas the feasibility of such a plan.

The defendants' motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure is denied.

It is so ordered.

[See Appendix on the following page]

APPENDIX